Raymond J. DONOVAN, Secretary of the United States Department of Labor, Plaintiff-Appellant,

v.

John C. BIERWIRTH, Robert G. Freese, Carl A. Paladino, Defendants-Appellees,

Joseph W. Ullman, Lillian E. Baldissard, Rita V. Hafner, Anthony Pancella, Jr., Kathleen T. Chew and Benjamin L. Crews, Intervenors-Defendants.

Robert J. LAWRENCE, Plaintiff-Appellant,

v.

GRUMMAN CORPORATION PENSION PLAN, Grumman Corporation Employee Investment Plan, Carl A. Paladino, John C. Bierwirth, Robert G. Freese, Robert W. Bradshaw, Howard J. Dunn and Grumman Corporation, Defendants,

Carl A. Paladino, John C. Bierwirth and Robert G. Freese, Defendants-Appellees.

No. 100, Dockets 84–6130, 84–7290.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1984.

Decided Feb. 6, 1985.

Jane M. Kheel, Washington, D.C. (Francis X. Lilly, Robert N. Eccles, Norman P. Goldberg, Thomas L. Holzman, U.S. Dept. of Labor, Washington, D.C., of counsel), for the plaintiff-appellant Raymond J. Donovan.

Frederick M. Reuss, Jr., Henry K. Reisch, Reuss, Ruchala & Handler, Garden City, N.Y., of counsel, for the plaintiff-appellant Robert J. Lawrence.

Raymond L. Falls, Jr., New York City (David R. Hyde, P. Kevin Castel, Richard S. Weisman, Cahill, Gordon & Reindel, New York City, of counsel), for the defendants-appellees John C. Bierwirth, Robert G. Freese and Carl A. Paladino.

Before FRIENDLY, MESKILL, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Before us on these consolidated appeals are: the Secretary of the United States Department of Labor ("Secretary") and Robert J. Lawrence, plaintiffs-appellants, and John C. Bierwirth, Robert G. Freese, and Carl A. Paladino, defendants-appellees, who are the trustees ("Trustees") of the Grumman Corporation Pension Plan ("Plan"). The Secretary and Lawrence appeal from judgments entered February 28, 1984, in the United States District Court for the Eastern District of New York, Jacob Mishler, *Judge*, after a joint trial of both plaintiffs' actions. The complaints alleged that the defendant Trustees violated their fiduciary responsibilities by improperly buying Grumman securities on behalf of the Plan. The plaintiffs sought, *inter alia*, recovery of any losses suffered by the Plan as a result of the Trustees' alleged breach. On February 21, 1984, the district court concluded that no losses were sustained by the Plan. We reverse and remand the question of loss to the district court for findings of fact as to what the Plan would have earned but for the Trustees' purchase of the Grumman stock.

## I. BACKGROUND

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA" or "Act"), 29 U.S.C. §§ 1001–

1381 (1982). The facts are set forth in earlier proceedings in this matter, *see Donovan v. Bierwirth*, 538 F.Supp. 463 (E.D.N.Y.1981), *aff'd as modified*, 680 F.2d 263 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). A brief recapitulation suffices for our purposes.

On September 24, 1981, the LTV Corporation ("LTV") made a tender offer for a controlling interest in Grumman Corporation at a price of $45 per share. At that time, the Plan held approximately 525,000 shares of Grumman stock. The Trustees, who were also highranking officials of Grumman,[1] determined not to tender any of these shares and on October 12 and 13 used Plan funds to purchase 1,158,000 additional shares of Grumman stock at the prevailing market price in an effort to defeat the tender offer. The day before the tender offer was announced, Grumman stock sold for $26.75 per share. The next day, after announcement of the tender offer, the price rose to $35.88 per share. On October 12 and 13, when the Trustees made the purchases, Grumman stock was selling at $36 to $39.34. On October 14, LTV's tender offer was preliminarily enjoined by Judge Mishler on antitrust grounds, *Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86 (E.D.N.Y.), *aff'd*, 665 F.2d 10 (2d Cir.1981). The Secretary brought this action on October 19, 1981, seeking injunctive relief, appointment of a receiver, and recoupment of the Plan's losses. The tender offer ultimately failed, and the price of Grumman stock dropped in the next month to approximately the pre-tender offer level of $23 per share. On December 3, 1981, the district court concluded that the Secretary had "shown a likelihood of success on his claim that each of the trustees has acted imprudently with respect to their recent investment decisions concerning Grumman stock." 538 F.Supp. at 476. Subsequently the court entered an order that preliminarily enjoined the Trustees from buying, selling or exercising any

rights with respect to Grumman securities except upon further order of the court and directed the appointment of a receiver to serve as an "Investment Manager" for Grumman securities owned by the Plan with "power to tender for sale, or otherwise dispose of all or part of such stock or securities." 680 F.2d at 265. We modified the order of the district court by striking the appointment of the Investment Manager and, as modified, affirmed. *Id.* at 277. Approximately seventeen months after the stock was purchased, the Trustees, with the district court's permission, sold the stock, together with some of the previously-held Grumman shares, for $47.55 per share. Including dividends, the amount earned by the Plan on the shares purchased during the tender offer was, net of commissions, $11.41 per share (selling price of $47.55 per share, plus dividends of $2.20 per share, less average purchase price of $38.34 per share), or $13,212,780 total.

On remand, Judge Mishler stated that he would "try the case in steps," taking evidence on the issue of loss to the Plan before taking additional evidence on the question of breach of duty, as to which we had affirmed the preliminary injunction. Joint Appendix at 147–48. A bench trial on loss was held on December 19 and 20, 1983. The district court found, based in part upon expert testimony, that the market price of Grumman stock on October 12 and 13, 1981 was distorted by the pending tender offer and that the fair market value of the stock at that time was only $23 per share. *Donovan v. Bierwirth*, No. CV 81–3408, slip op. at 4 (E.D.N.Y. Feb. 21, 1984).

On February 21, 1984, Judge Mishler dismissed the complaint because he found no likelihood of breaches of fiduciary duty in the future, and that the Plan had not suffered a "loss" within the meaning of ERISA section 409(a), 29 U.S.C. § 1109(a) (1982).[2] Thus, an injunction was held to be

---

**1.** At all relevant times the trustees of the Grumman plan were: John C. Bierwirth, chief executive officer of Grumman Corporation; Robert

G. Freese, chief financial officer; and Carl A. Paladino, treasurer.

**2.** ERISA section 409(a), 29 U.S.C. § 1109(a) (1982), provides in pertinent part:

unnecessary and the Trustees were held to have incurred no personal liability under section 409(a).

The chief issue presented for our review concerns the applicable measure of damages. Specifically, if securities are purchased in breach of trust but are later sold at a price exceeding the purchase price, is there a "loss" within the meaning of ERISA section 409?

## II. DISCUSSION

■ In resolving the question whether the Plan sustained a "loss," we bear in mind that the Trustees, if ultimately found to have breached their fiduciary duties, will be liable personally for any such "loss" pursuant to section 409.[3] ERISA does not define "loss" as that term is used in section 409. The Act's legislative history, however, indicates that Congress' intent was "to provide the full range of legal and equitable remedies available in both state and federal courts." H.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974–3 U.S. Code Cong. & Ad.News 4639, 4655. Measuring damages involves the application of law to fact; the proper formula for calculating damages is essentially a question of

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be the subject of such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. We note at this juncture that the district court apparently assumed, for the purpose of assessing the "loss" to the plan as a personal liability of the Trustees, that a breach took place: "The Court finds the plan suffered no loss as a result of the trustees' violation of their fiduciary obligation." *Donovan v. Bierwirth,* No. CV 81–3408, slip op. at 6 (E.D.N.Y. Feb. 21, 1984). The Court had earlier stated: "The trustees' breach did not result in a loss." *Id.* at 5. We make the same assumption in resolving the question of loss, for the reasons set forth *infra* note 3. Additionally, a finding of breach, had it been made, would appear to be sustained by ample evidence. In addition to the evidence before the court in the

law. *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 603 (2d Cir.1978); *see* C. McCormick, *Handbook on the Law of Damages* ch. 2 (1935). Consequently the "clearly erroneous" standard does not apply; rather, "it is enough that the appellate court should be convinced ... that the result [does or] does not jibe with the applicable rule of law." *In re Joseph Kanner Hat Co., Inc.,* 482 F.2d 937, 939 (2d Cir. 1973) (quoting *In re Hygrade Envelope Corp.,* 366 F.2d 584, 588 (2d Cir.1966)); *accord Bose Corp. v. Consumers Union,* — U.S. ——, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984); 5A J. Moore, *Moore's Federal Practice* ¶ 52.03[2], at 2663 (2d ed. 1977).

The district court set out its proposed measure of loss in its June 3, 1983 denial of the parties' motions for summary judgment: "The question then is whether the gain of $13,212,780 is of such magnitude that it offsets (1) the loss to the Plan, as alleged by the Secretary, at whatever fair value is ultimately found respecting Grumman securities on October 12 and 13, plus (2) the income that the Plan would have earned if the funds used to purchase such securities were invested with other Plan

earlier preliminary injunction proceeding, see 680 F.2d at 272–76, additional evidence offered at trial tended to show that at the time the Trustees purchased the stock, they expected its price to drop because they expected to successfully frustrate the tender offer. *See* Joint Appendix at 257–58, 483–84, 497, 633–35, 639, 672, 673A–73B. This would strongly suggest a violation of the "prudent man" requirements of ERISA § 404, 29 U.S.C. § 1104 (1982). Nevertheless, the colloquy between the court and counsel on the opening day of trial reveals considerable confusion on the part of all as to what was to be tried on remand from our previous decision. *See* Joint Appendix at 142–53, 400. The issue of breach thus remains to be finally determined by the district court, which may, of course, take further evidence on the question if it deems it necessary.

3. Pursuant to section 409(a), the Trustees would be personally liable for the "losses," if any, suffered by the Plan as a result of their alleged breach of duty. While there can be a breach of duty without any "loss" to a plan, no loss to a plan will result in personal liability under section 409 without a breach of duty.

assets." Evidence was taken in a bench trial on December 19 and 20, 1983. Judge Mishler rendered a decision on February 21, 1984, but it contained no finding of fact as to the second part of the court's proposed test, namely the income that the Plan would have earned had the funds been invested with other plan assets. Rather, the judge found that "loss" to the Plan would be established only if the stock had been sold for less than its purchase price, that is, less than $38.34 per share. Since it was sold for more than this price, the district court dismissed the complaint. It appears to us that the measure the court applied in doing so is inconsistent with the measure set forth in its June 3, 1983 denial of summary judgment. The June 3 decision incorporates in part the Secretary's measure, with which we disagree for reasons stated below. The February 24, 1984 dismissal of the complaint appears in large part to adopt the Trustees' proposed measure, and we reject that measure also. Consequently, we reverse the judgment of the trial court.

The Secretary argues that the proper measure of loss looks to the amount of overpayment at the time of the stock purchase. Applied to the facts before us, his analysis compares the price actually paid by the Trustees, $38.34 per share, with the "fair value" of the stock on the dates of purchase, defined as the price of the stock absent the influence of the tender offer. Expert testimony at trial suggested that this value was between $22 and $23 per share; the trial court found that it was $23. Because the "fair value," $23, was less than the amount actually paid for the shares, $38.34, the Secretary would find a "loss" at the moment the purchase was made. This loss would amount to $15.34 per share.

The district court's proposed measure of loss accepted the Secretary's view, but also required a finding as to the "income that the Plan would have earned if the funds used to purchase [the Grumman stock] were invested with other Plan assets." The Secretary accordingly presented evidence as to the investment performance of the other Plan assets, including the Plan's total portfolio, the Plan's "stock and cash" portfolio, and the Plan's stock portfolio. This evidence showed a higher rate of return from investing in each of these alternative portfolios than was actually realized on the investment in Grumman stock. These differences varied from greater total earnings of $1,818,060 from investing in the Plan's "stock and cash" portfolio to greater total earnings of $4,655,160 from investing in the Plan's stock portfolio. Tracking the trial court's proposed damages formula of June 3, and adding these losses to the amount paid over the "fair value" of the Grumman stock, the Secretary claimed that the total loss was between $20,380,000 and $23,217,900. Plaintiff's Exhibit 5, Joint Appendix at 481A.[4]

The Trustees, on the other hand, presented evidence suggesting that if the funds had not been invested in the Grumman shares, they would have remained in short-term cash equivalents, where they would have earned only a relatively low return compared with the portfolios analysed by the Secretary. Accepting the Trustees' contentions as true, under the district court's formula of June 3, 1983, the Plan lost approximately $11,700,000.[5] The Trus-

---

**4.** The Secretary's results were based upon his view that the "fair value" of Grumman stock was $22.31 per share, with an overpayment of $16.03 per share. The "fair value" actually found by the district court, however, was $23 per share, with an overpayment of only $15.34 per share. Using the court's figure, the total losses under the June 3 formula would be lower by the difference between these two values ($0.69) times the number of shares (1,158,000), i.e. $799,020. Deducting this amount from the Secretary's figures yields a loss in the range of $19,580,980 to $22,418,880.

**5.** This figure is derived by taking the "overpayment" of $15.34 per share (see *supra* note 4) and multiplying it by 1,158,000 shares, for a total overpayment of $17,763,720. Investment income on the Plan's short-term cash equivalents accumulated at approximately 11% annually. Joint Appendix at 398. The investment income for the period of October 13, 1981 to March 10, 1983 (when the Grumman shares were sold) on the amount used to purchase the Grumman shares thus would have been $7,142,482. The overpayment together with the lost investment

tees, however, like the Secretary, do not agree with the trial court's June 3 proposed measure of loss.[6] Rather, the Trustees argue that because more was returned to the Plan than was used to purchase the Grumman stock, no "loss" within the meaning of ERISA section 409 was sustained. This measure closely resembles that applied by the trial court in dismissing the complaint.

We do not accept the measures proposed by the parties, nor that applied by the trial court. The Trustees' measure, and that applied by the district court, require no comment beyond stating that they ignore the greater profits the Plan might have earned if the Trustees had invested in other Plan assets, rather than in Grumman while it was the target of the LTV tender offer. *Cf.* Restatement (Second) of Trusts § 205(c) (1959) (trustee is liable for "any profit which would have accrued to the trust estate if there had been no breach of trust").

The Secretary's measure has more initial appeal. Losses to a trust are sometimes measured by the amount of "overpayment" for property acquired for the trust. This measure has been applied chiefly in two lines of cases. In the first, the purchase price exceeds the market price; if the beneficiary were to attempt to sell the property, he would recover only the market value and the amount of the overpayment would be the loss. *See, e.g., Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *Michelsen v. Penney,* 135 F.2d 409, 420–21 (2d Cir.1943); *Oliver v. Lansing,* 48 Neb. 338, 67 N.W. 195, 196, 199 (1896); *Murphy-Bolanz Land Co. v. McKibben,* 236 S.W. 78, 79–80 (Tex.Comm'n App.1922); Restatement (Second) of Trusts § 205 com-

ment e & illustration 9 (1959). Thus, if the Trustees had, for example, purchased the stock for $40 per share when it was selling on the market for $38.34, it might be concluded that the loss suffered by the Plan was the difference between the two figures, or $1.66 per share.

We hesitate, however, to extend this reasoning to the case before us. It is one thing to state that a payment in excess of the market price results in a loss measurable by the amount of the overpayment; it is quite another to say that payment of the market price, with all material facts known to all the parties, leads as a matter of law to a similar loss when the price paid is in excess of a "fair value" determined by expert testimony. In the case at bar, had the Trustees determined an hour later or the next day to sell the shares back into the market, it is likely that they would have received approximately the same price as they paid. Under such circumstances, it would be incongruous to hold that an irretrievable loss occurred at the moment the Trustees purchased at market price.

In the second line of cases in which a measure of loss resembling that proposed by the Secretary has been adopted, the market price of securities was manipulated by the defendants or information that would affect the market price was improperly withheld from the plaintiffs. *E.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 576–78 (2d Cir.), *cert. denied,* 459 U.S. 838, 908, 103 S.Ct. 86, 213, 74 L.Ed.2d 80, 170 (1982); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 555–57 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Green v. Occidental*

---

income would be $24,906,202. Setting off against this the profit earned on the sale of the Grumman shares, $13,212,780, the net loss under the district court's two-step formula would be $11,693,422.

**6.** Although under the trial court's formula of June 3, 1983, the Secretary would have been able to show that a loss took place, on appeal he argues that the proper measure of loss would not allow any credit for profits earned on the eventual sale of the Grumman stock. Reply

Brief of Plaintiff-Appellant Raymond J. Donovan at 23. On the other hand, the Secretary does not seem to be seeking profits lost to the Plan. *See id.* The only party to this appeal who apparently is in agreement with the trial court's proposed measure of loss is appellant Lawrence, a private plaintiff who is an employee of Grumman Corporation and a participant in the Plan. *See* Brief of Plaintiff-Appellant Robert J. Lawrence at 8–13.

*Petroleum Corp.,* 541 F.2d 1335, 1346 (9th Cir.1976); *Harris v. American Investment Co.,* 523 F.2d 220, 224–27 (8th Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Bonime v. Doyle,* 416 F.Supp. 1372, 1384–86 (S.D.N.Y.1976), *aff'd,* 556 F.2d 554 (2d Cir.1977), *cert. denied,* 434 U.S. 924, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977). In such cases, it may well be that the best measure of damages is one that awards the plaintiff the difference between what was paid for the stock, and what would have been paid had the plaintiff been aware of the concealed information, or had the market price not been manipulated. Defendants' conduct in these cases caused the plaintiffs to sell too cheaply or to buy too dearly; in such instances, it is appropriate to hold such defendants liable for the difference between what the plaintiffs paid or received in payment and what the stock was in fact worth.

■ The case at bar, however, does not involve fraud, or the withholding of information, or the manipulation of prices. The market price was elevated by the influence of the tender offer, but the elevation did not depend upon the concealment of any information. There was only the market price at which the stock traded, and because all the relevant information was public, we consider it to be the "fair" market price. We see no need in this case to resort to expert testimony to determine the "fair value" of the Grumman shares on the dates of purchase. We therefore reject the Secretary's proposed measure of loss.

■ For the same reason, we find the district court's measure of June 3, 1983 inappropriate. This measure takes the "overpayment" measure of loss based upon "fair value" as suggested by the Secretary, and adds to it investment income that was lost because of the Grumman investment, that is, the amount that the Plan would have earned had the funds used to purchase the Grumman shares instead been used to purchase other Plan assets. While we agree that the second part of the test sheds light on the question of loss, we do not believe it appropriate to add to this

figure the amount paid in excess of the Secretary's hypothetical "fair value."

■ Since we have rejected the three measures of loss proposed to us, our task is to determine what the measure of loss in this case ought to be. Because section 409 speaks in terms of "losses ... resulting from [a] breach," we assume for purposes of resolving this question that a breach of fiduciary duty has been established, as indeed it was for purposes of preliminary relief. We recognize that state law has been preempted by ERISA. *See* 29 U.S.C. § 1144(a) (1982). Nevertheless, it is "clear that Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty." *Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir.1978) (citing S.Rep. No. 127, 93d Cong., 1st Sess., *reprinted in* 1974–3 U.S.Code Cong. & Ad. News 4838, 4871). We thus look to principles developed under the common law of trusts, which in large measure remain applicable under ERISA. *Leigh v. Engle,* 727 F.2d 113, 122–23 (7th Cir.1984); *Donovan v. Cunningham,* 716 F.2d 1455, 1464 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). Still, we recognize, as the Secretary points out, that ERISA standards were intended to be construed in light of the nature of modern employee benefit plans. *Marshall v. Teamsters Local 282 Pension Trust Fund,* 458 F.Supp. 986, 990 & n. 9 (E.D.N.Y.1978); H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 1974–3 U.S.Code Cong. & Ad.News 5038, 5083. One characteristic of these plans is that they control large pools of capital, which are frequently partly invested in the securities markets. Fiduciaries of such plans may be called upon to make decisions regarding tender offers and other contests for corporate control. *See, e.g., Donovan v. Bierwirth,* 680 F.2d at 275–76; *Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984). Clearly, there is a need to deter abuses in these areas, where the temptation to misuse funds often may be especially strong. *Brink v. DaLesio,* 667 F.2d 420,

427 (4th Cir.1982) (citing *Marshall v. Snyder*, 430 F.Supp. 1224, 1231 (E.D.N.Y.1977), *aff'd*, 572 F.2d 894 (2d Cir.1978)).

Fiduciary abuses may be deterred in various ways. One method is to impose personal liability upon trustees for losses sustained by pension plans as a result of such abuses. Additionally, for certain statutorily-enumerated types of fiduciary misconduct, Congress has legislated penalty provisions in the nature of surcharges and excises. *See* 29 U.S.C. §§ 1106, 1132(a)(6), (i) (1982). The Act also provides criminal penalties for "willful" violations of its provisions. *Id.* § 1131. Although such penalties are not claimed to be at issue here,[7] Congress' enactment both of penalty provisions and provisions requiring losses suffered by a pension plan to be repaid suggests that the two kinds of provisions have different aims. Section 409, by providing for the recovery of losses, primarily seeks to undo harm that may have been caused a pension plan by virtue of the fiduciaries' acts.

■ One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust. Restatement (Second) of Trusts § 205(c) (1959); *see Eaves v. Penn*, 587 F.2d at 463. In view of the intent expressed by Congress in providing for the recovery of "losses," and in the absence of evidence of congressional intent to penalize, as such, violations of section 409, we hold that the measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the Grumman investment with what the Plan would have earned had the funds been available for other Plan purposes. If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained. *See id.;* Restatement (Second) of Trusts § 205(c) (1959); *see also In re Impe-*

*rial "400" National, Inc.,* 456 F.2d 926, 931 (3d Cir.1972); *Perkins v. Waukesha National Bank,* 290 F.2d 912, 918 (7th Cir.), *cert. denied,* 368 U.S. 928, 82 S.Ct. 363, 7 L.Ed.2d 191 (1961).

■ In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them. *See Wootton Land & Fuel Co. v. Ownbey,* 265 F. 91, 99 (8th Cir.1920) (burden of proof in an accounting is on fiduciary to prove the amount of any credit); *Vinlis Construction Co. v. Roreck,* 30 App.Div.2d 668, 291 N.Y.S.2d 924 (2d Dep't 1968) (burden of proof in an accounting is on fiduciary to show he has derived no unfair advantage from his relationship), *modified on other grounds,* 27 N.Y.2d 687, 262 N.E.2d 215, 314 N.Y.S.2d 8 (1970); *cf. Armory v. Delamirie,* 93 Eng.Rep. 664 (1722) (the "Chimney Sweep's Jewel Case") (plaintiff bailed jewel with defendant, who failed to return it: *held* "unless the defendant ... produce the jewel, and shew it not to be of the finest water, [the jury] should presume the strongest against him, and make the value of the best jewels the measure of [plaintiff's] damages"). This is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer. *See Leigh v. Engle,* 727 F.2d at 138; *McMerty v. Herzog,* 710 F.2d 429, 431 (8th Cir.1983).

---

**7.** Our earlier decision in this matter held that the action of the Trustees in purchasing the Grumman shares during the pendency of the tender offer did not violate the specific prohibitions of 29 U.S.C. § 1106 (1982), which trigger

the penalty provisions of *id.* § 1132. *See Donovan v. Bierwirth,* 680 F.2d 263, 270 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

■ Determining what portfolios are to be compared, however, does not end our inquiry. The value of each portfolio is likely to vary every business day. The question then remains, as of what date should the portfolios be valued? Herein, there was an actual sale of the Grumman securities, and therefore the amount realized on the sale should be compared with the earnings, if any, that would have been realized through alternative investment over the same period of time. In the event there were no sale, breaching fiduciaries might argue that they should be given indefinite extensions of time in which to hold the improperly purchased property, because it might appreciate in value, thereby reducing their personal liability. Such apparently was the case in *In re Whitely*, 33 Ch.D. 347, 354–55 (Ct.App.1886), *aff'd sub nom. Learoyd v. Whitely*, 12 App.Cas. 727 (House of Lords 1887). In *Whitely*, trustees imprudently invested in a brickfield, thereby breaching their fiduciary duty, but were allowed to defer payment of damages until an unspecified later time when the market for the property might have improved, thereby reducing the personal liability of the trustees.

We do not agree with the holding in *Whitely*. Such a rule would put control of the remedy in the hands of the wrongdoing fiduciaries, a result that we find unacceptable. Instead, if confronted with facts similar to those in *Whitely*, the court might properly select a date for valuation between the date suit was filed and the date of the entry of judgment. The value of the improper investment on that date could then be compared with the performance of the portfolio in which the improperly used funds would have been invested but for the breach of fiduciary duty, with the burden of proof on the trustees to show that the funds would have been put to less than their most profitable use.

A similar time-of-valuation rule has been adopted in securities fraud cases, albeit for a different reason. For example, when a buyer defrauds a seller, the seller might seek to recover the buyer's ill-gotten gains, including gains realized long after the facts fraudulently concealed have been made known to the public. *E.g., SEC v. MacDonald*, 699 F.2d 47, 52 (1st Cir.1983) (*en banc*). Rather than permitting such a result, courts have allowed recovery only of profits earned up to a reasonable time after the information has been made public, on the theory that upon disclosure, the defrauded seller could have replaced the securities and himself earned the additional profits. *Id.* at 53. Once the material information is made public and the market returns to normal, the defendant's action in retaining the stock is a new act, unrelated to the initial fraud. *Id.* at 53–54. The profit earned subsequent to discovery of the fraud is "purely new matter." *Id.* at 54; *see also Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1198–1200 (8th Cir. 1978); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1306 n. 27 (2d Cir.1973); *Mitchell v. Texas Gulf Sulfur Co.*, 446 F.2d 90, 105 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 734, 30 L.Ed.2d 754 (1971), 405 U.S. 918 (1972); *Baumel v. Rosen*, 412 F.2d 571, 576 (4th Cir.1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 688, 24 L.Ed.2d 681 (1970); *Myzel v. Fields*, 386 F.2d 718, 744 n. 23, 746 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

The Secretary argues that we should follow *MacDonald* and, in ordering relief, should hold the subsequent sale of the stock at a price exceeding its purchase price to be "irrelevant." Reply Brief of Plaintiff-Appellant Raymond J. Donovan at 11. The reasoning of *MacDonald* and like cases, however, is plainly inapposite to the case before us. The question of loss to the Plan, as we noted above, requires a comparison between the actual performance of the Plan and the performance that otherwise would have taken place. In making this determination, it can scarcely be found to be "irrelevant" that the securities in question were sold for more than their purchase price. The amount earned on the allegedly improper investment has a direct bearing on the amount of any loss ultimately sustained as determined by comparison

with earnings on other Plan investments. In the case before us, there had been no publicizing of previously unknown material information that might render a positive amount realized on the transaction "irrelevant."[8] Of importance, however, is the need to ensure that trustees who misuse funds not be permitted to delay determinations of loss indefinitely in the hope of avoiding a statutory "loss." The trial court must have discretion to fix a reasonable time at which the actual performance of the improper investment will be measured and compared with the earnings performance which would have been realized but for the breach.

Such a determination is of necessity somewhat arbitrary. Without the benefit of hindsight, it is indeed difficult to know what the ideal amount is at which to evaluate plan performances. Still, we do not believe the problem to be incapable of resolution. The trial court, in its sound discretion, must pick a date on which the relative performance of the plan and the improper investment may fairly be compared. Without purporting to catalogue the relevant factors exhaustively, they include at least: (1) market conditions and abnormalities affecting the price of the improperly purchased stock; (2) such conditions as they affect the price of other assets of the plan at issue; (3) the court's determination of the relative price advantages to the plan of selling or holding the stock; and (4) the interests of the beneficiaries of the plan.

Any incentive to delay on the part of trustees in breach should be mitigated by the possibility that the improperly purchased stock may decline in value, and that a comparison will be made with the performance of the other plan assets. While the improperly purchased stock may increase in value in a rising market, very likely so will the other plan assets. The advantages of delaying the determination of damages are thus minimized.

Accordingly, we reverse the judgment of the district court and remand the cause for disposition consistent with the foregoing. If application of our formula should result in imposition of liability on the defendants, they are, of course, entitled to further proceedings on the issue whether they committed a breach of trust.

---

**8.** The Secretary disagrees with our interpretation of *MacDonald* as being based on the plaintiff's ability after disclosure to mitigate additional losses. Rather, he argues that the reason defendant's investment decisions after disclosure are irrelevant to the determination of damages is because disclosure removes the taint from the defendant's dealings. The Secretary suggests that a similar analysis is appropriate here. The breach of trust, if there was one, consisted in imprudently purchasing stock to defeat a tender offer; once the tender offer had been defeated, the Trustees were once again in a position to make prudent investment decisions. Thus, the Secretary concludes, their decision to hold the Grumman stock should be treated no differently than a decision to sell it and to reinvest the proceeds in other assets: in either case, the consequences of such decisions should not alter the Trustees' liability.

We reject this analysis for several reasons. First, we disagree with the Secretary's reading of *MacDonald*. Certainly the primary reason for the result in *MacDonald* was the plaintiff's ability after disclosure to prevent further losses.

699 F.2d at 52–54. Our own opinions have emphasized this as the reason to limit damages. *See Gerstle*, 478 F.2d at 1306 n. 27. More importantly, even conceding that there is some logic in the Secretary's reasoning, the situation here still differs in significant ways from securities fraud cases. After disclosure, the insider no longer has any advantage and his subsequent dealings *cannot* be deemed tainted by the original fraud. The same is not true here. While the original tender offer that led to the breach has ended, the Trustees may have continued to hold the stock to deter further tender offers. Indeed, this possibility remained so long as the Trustees continued to hold the shares. Only after the imprudently purchased stock was sold can it be concluded that the Trustees' investment decisions were conclusively purged of the original improper purpose. Where there is no sale, the possibility that trustees have retained the shares to deter other potential tender offerors should be a factor for the district court to consider when fixing a date for comparison under the formulation announced in this opinion.