SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

MARCUS SCHLOSS & CO., INC., Defendant.

No. 88 Civ. 0755 (MP).

United States District Court, S.D. New York.

June 6, 1989.

S.E.C., New York Regional Office, New York City by Lawrence Iason, Reg. Adm., Carmen J. Lawrence, Jeffrey R. Zuckerman, Elliott Dobin, for plaintiff.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City by Bernard Beitel, of counsel, King & Spalding, Atlanta, Ga. by L. Joseph Loveland, for defendant.

MILTON POLLACK, Senior District Judge.

The Securities and Exchange Commission (SEC) filed this action against Marcus Schloss & Co., Inc. (Marcus Schloss) under the Insider Trading Sanctions Act of 1984 (ITA), 15 U.S.C. § 78u(a)(2). Pursuant to the final judgment, Marcus Schloss, without admitting the complaint's allegations, disgorged profits from certain securities transactions and deposited those monies with the Court's registry.

AM Acquisition, Inc. (AM) claims it sustained damage from the insider trading carried on by Marcus Schloss in the stock of Avondale Mills, Inc. AM seeks reimbursement of that damage from the disgorgement fund recovered by SEC.

For the reasons appearing hereafter, the claim of AM against the Marcus Schloss fund will be denied. AM has not established that its alleged damage was proximately related to the insider trading or that the insider trading proximately caused its loss.

## Procedural Background

On February 3, 1988, the SEC sued Marcus Schloss for alleged violations of §§ 10(b) and 14(e) of the Securities Exchange Act and Rules 10b–5 and 14e–3 promulgated thereunder, 15 U.S.C. §§ 78j(b), 78n(e); 17 C.F.R. §§ 240.10b–5, 240.14e–3. The complaint alleged Marcus Schloss engaged in insider trading in the common stock of Avondale Mills and other securities.

Marcus Schloss consented to judgment against it, including payment into the Court of $136,000 in disgorged profits, as well as payment to the United States Treasury of $273,800 in civil penalties under the ITA. The judgment provided, among other things, that:

The account [disgorgement] shall be held by the Depository for a period of one year from the date of this Final Judgment to be utilized for payment to any persons whom the Court finds to have valid claims against defendant Marcus Schloss arising under the federal securities laws by reason of the securities transactions alleged in the Commission's Complaint;

In a subsequent order it was provided in respect of AM's Claim as follows:

ORDERED, that AM's Claim shall not be adjudicated until a date to be determined but in no event prior to February 10, 1989, by which time all potential claimants to the disgorgement fund will have had a full opportunity under the terms of the Final Judgment to come forward with any claims they may have; and it is further

ORDERED, that in the event any other claimants come forward to assert an interest in the disgorgement fund between the date of this Order and February 10, 1989, such claims shall not be adjudicated until a date to be determined but in no event prior to February 10, 1989.

AM's claim, filed on or about November 18, 1988, was the only claim asserted against the disgorgement fund during the period fixed therefor.

AM, a Delaware corporation, was formed on or after March 15, 1986, for the express purpose of acquiring all of the outstanding common stock of Avondale in a reverse triangular merger. AM set forth the substance of its claim as follows:

The illegal insider trading engaged in by Marcus Schloss distorted the market for the stock of Avondale and forced AM Acquisition to increase the price ultimately paid for the 4,000,000 shares of common stock of Avondale acquired under the Amended and Restated Agreement and Plan of Merger and the Stock Purchase Agreement.... The damages sustained by AM Acquisition in acquiring the outstanding shares of Avondale pursuant to the Merger Agreement greatly exceed the illegal profits realized by Marcus Schloss as a result of its illegal insider trading.

The SEC opposes AM's claim for reimbursement from the disgorgement fund on the grounds that AM failed to establish any causal link between the illegal conduct of Marcus Schloss and AM's decision to acquire Avondale for $28.20 per share in a cash merger, and therefore, is an ineligible claimant. The $28.20 price was reached after arms-length negotiations, more than one month after Marcus Schloss purchased its 20,000 shares, and after three intervening bids by other suitors. The SEC contends that:

On these facts, there is neither "transaction" causation nor "loss" causation sufficient to state a claim for relief herein. *See Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13, 20 (2d Cir.1986), *cert. denied, sub nom. Arthur Anderson & Co., Inc. v. Manufacturers Hanover Trust Co.,* 479 U.S. 1066 [107 S.Ct. 952, 93 L.Ed.2d 1001] (1987). Indeed it is difficult to fathom how AM suffered any loss whatsoever, let alone a loss brought about by Marcus Schloss' trading.

## The Underlying Facts

The basic chronology of events underlying AM's claim is as follows: On February 5, 1986, the Board of Directors of Avondale

Mills announced the approval of a merger agreement with Walton Monroe Mills, Inc. and its wholly owned subsidiary WM Sub, calling for cash payment of 23.41 per share. The agreement contained a number of conditions, including arranging "definitive financing" and issuance of a fairness opinion by an investment banking firm selected by Avondale Mills.

The SEC's complaint in this action alleged that Michael N. David, an associate with a New York City law firm, told Andrew Solomon of Marcus Schloss that Dominion Textile, Inc., a client of his law firm, within the next two weeks would make a tender offer for Avondale Mills for approximately $24 per share, and might later raise that bid to as much as $26 per share. This disclosure allegedly occurred on February 20 or 21, 1986. According to the complaint, Marcus Schloss purchased 20,000 shares of Avondale on February 21, 1986, at $22 per share while in possession of this material, non-public information.

Dominion announced a $24 per share tender offer for Avondale Mills on February 27, 1986. On March 12, 1986, the Spectrum group topped Dominion's offer with a $26 per share bid. Avondale Mills' price at the close of the market was $26⅜ per share that day.

The first Dominion offer led to discussions between Walton Monroe Mills and Avondale Mills regarding the possibility of an increase in the initial merger agreement's purchase price. AM was formed to carry out those plans. Avondale Mills' proxy statement indicates: "On March 15, 1986 representatives of Walton commenced discussions with representatives of First Boston, which led to the organization of Acquisition."

On March 18, 1986, Dominion matched the Spectrum Group's bid of $26 per share. Nine days later on March 27, 1986, Walton, AM, Avondale and an AM subsidiary entered into an amended merger agreement, calling for payment of $28.20 per share in cash. Marcus Schloss tendered its 20,000 shares at that price.

AM paid $2.20 more per share than the last prior bid, and $4.20 more than Dominion's initial bid. As noted above, Avondale Mills' proxy statement to shareholders in the merger represented that the parties negotiated the final price on an armslength basis and that management had determined the proposed merger was in the best interest of the company and its shareholders. A fairness opinion by E.F. Hutton stating that "the $28.20 in cash for each Share to be received in the Merger is fair to the shareholders of the Company from a financial point of view," was one of the items the board considered when making its decision.

## Analysis

### Burden of Proof

AM suggests that since disgorgement has already occurred and the only question is whether AM or the United States Treasury will take the funds, AM should somehow be held to a lesser burden of proof:

> Even assuming, *arguendo*, that AM Acquisition would not have standing, under *Moss*, to maintain a civil suit against Marcus Schloss, nothing in the Second Circuit's decision in *Moss* suggests that the definition of standing articulated there should be applied to the equitable issue of distribution of disgorged profits.

There is no prior case law discussing the appropriate standard of proof for claimants to a disgorgement fund. Establishing a lower standard than the normal requirements for establishing a right to recovery would, in this context, create an anomaly. Parties with no standing to pursue a direct action against persons who engaged in insider trading could recover if the government pays the bill for the lawsuit, but not if they file suit themselves.

### Causation

AM contends Marcus' insider trading increased the price it paid for Avondale stock in the merger. According to AM, Marcus' purchase of 20,000 shares of a thinly traded stock directly affected the market, and thereby influenced the price of Dominion's tender offer. AM argues that Dominion's offer, in turn, affected the price of subsequent offers and the price ultimately paid

by AM. The SEC responds that the public announcement of Dominion's tender offer (the inside information on which Marcus' allegedly traded) severed any causal relationship between Marcus' trading and AM's purchase price.

■ Causation in the 10b–5 context generally requires that the wrongful conduct play a "substantial" or "essential" part in bringing about the damage sustained. *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011 (1980). The undisputed facts indicate that any link of causation between Marcus' acts and the price offered by AM is too tenuous to support a claim against the disgorgement fund.

The effect of Marcus' trading on the price AM paid is negligible at best. The SEC's complaint alleged that prior to its trading, Marcus received information that Dominion would offer approximately $24 in an initial bid. Dominion made a tender offer at that price, an increase of $ .59 per share from the agreement with Walton Monroe. After the material nonpublic information upon which Marcus' allegedly traded became public on February 27, 1986 three additional tender offers were made. Two offers, Spectrum Group's and the second Dominion offer, reflected an increase of $2.00 per share above Dominion's first offer. AM's offer of $28.20, was $2.20 higher than the previous offers and $4.20 higher than Dominion's initial offer. In light of the disparity between the $ .59 increase in offering price and the later increases, it is difficult to see how Marcus' trading was a substantial factor in the price offered by AM.

■ Two cases decided by the Second Circuit, *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir.1985), and *SEC v. Shapiro*, 494 F.2d 1301 (2d Cir.1974), further suggest that any causal connection between Marcus Schloss' insider trading and AM's damage is too tenuous to support AM's claim. These cases held that in determining causation, and therefore the amount of profit to be disgorged in insider trading cases, a court should measure the illegal profits from the time of the insider trading until a reasonable time after the material nonpublic information has been made public. The Court in *Donovan* noted, "[o]nce the material information is made public and the market returns to normal, the defendant's action in retaining the stock is a new act, unrelated to the initial fraud." 754 F.2d at 1053–54. The same causation analysis applies here. AM issued its bid for Avondale well after the inside information on which Marcus Schloss traded became public. All investors were trading on equal footing at the time AM issued its tender offer. It would be illogical to adopt, as AM suggests, two different standards for analyzing causation depending on whether the court is considering creation of a disgorgement fund, or whether to permit claims against that same fund.

Finally, there is no clear indication that AM relied on the integrity of the market price in determining the amount of its bid. The merger proxy statement indicated that Avondale, AM and AM's affiliates negotiated the final price on an arms-length basis. E.F. Hutton rendered an opinion on the fairness of the price. As Judge Cannella noted in *Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb, Inc.*, 709 F.Supp. 438 (S.D.N.Y.1989), in a tender offer situation where the purchaser negotiated the transaction rather than purchasing stock on the open market, it is not logical to presume reliance and causation simply because the market price may have been inflated.

The claim of AM against the disgorgement fund is rejected. Since no other claim has been asserted against the fund in accordance with the terms of the judgment herein, the Clerk of the Court is directed to pay the fund created by the Final Judgment entered February 3, 1988 in this matter, along with any interest accrued thereon, to the Treasury of the United States, and close this docket.

SO ORDERED.