**Eddie J. CONNER**

v.

**MID SOUTH INSURANCE AGENCY, et al.**

**Civil Action No. 92–0076.**

United States District Court, W.D. Louisiana, Alexandria Division.

Dec. 14, 1995.

---

**650**

George Bruce Kuehne, Office of Robert C. Schmidt, Baton Rouge, LA, for Eddie J. Conner.

Andrew D. Weinstock, Duplass Zwain & Williams, Metairie, LA, Michael E. Roach, Lake Charles, LA, for Mid South Insurance Agency, Inc., Mid South Ins. Agency, Inc., Employees Thrift Plan and Paul G. Zimmerman.

Frederick M. Stoller, Edward P. Gothard, McCloskey Langenstein & Stoller, New Orleans, LA, for Judy Newman.

Andrew D. Weinstock, Lawrence J. Duplass, Duplass Zwain & Williams, Metairie, LA, for Aetna Insurance Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LITTLE, District Judge.

The gravamen of plaintiff's complaint concerns the investment of pension plan funds in the stock of plaintiff's employer. Succinctly stated, upon plaintiff's departure from employment, he has discovered that his pension plan investment failed to grow, and he claims that defendants are liable for the resulting loss. For the most part, we agree with plaintiff's assertions. Our findings of fact and conclusions of law follow.

### I. Facts

On 4 February 1981, plaintiff Eddie J. Conner became an employee of Mid South Insurance Agency, Inc. (Mid South), a closely held corporation in Lake Charles, Louisiana. Throughout Conner's employment, Mid South offered an employee pension plan subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. Mid South was the employer, the plan sponsor and the administrator of the plan. Conner became a participant on 1 January 1982.

Prior to 1987, Mid South was owned by approximately thirty shareholders from the Lake Charles area. During the latter months of 1986 and the first half of 1987, Mid South Vice President J.B. Postell initiated and negotiated a seller-financed disposition of virtually all of the company's stock to a group which included himself, the plan, and a handful of other investors. The stock at issue in this and a later 1989 transaction were employer securities as defined by 29 U.S.C. § 1107(d)(1).

At the time of the transaction, the administrative committee and trustees of the plan were Willis Noland, Frank Pruitt, and Robert Noland. These men and members of their families owned Mid South stock. Willis Noland negotiated with Postell on behalf of his relatives who intended to sell stock to the plan, and he became trustee of the Mid South Trust, which was formed to facilitate the buyers' debt payments to the sellers. Pruitt and Robert Noland resigned their positions as formal fiduciaries of 31 July 1987, and

Willis Noland resigned effective 1 November 1987.

According to Postell, the purposes of the sale were to cash out the current stockholders and to permit employees, particularly himself, to become substantial owners of the company. He had proposed that the plan be involved, because it alone had enough cash to make a sufficient down payment. Each plan participant received the option in early 1987 to purchase Mid South shares for his plan account. Conner used $35,000 of his plan account for this purpose in June 1987.

In broad brush strokes, the details of the transaction were as follows. On 19 June 1987, the Mid South shareholders sold their stock to a new corporation, "Mid South Insurance Agency of Louisiana, Inc." (Mid South of LA) which was formed solely for the purpose of facilitating the stock transaction.[1] This new corporation was capitalized with the sum of $780,000, all but $100,000 of which was taken from the accounts of plan participants who had agreed to purchase stock. The plan's share of the capitalization constituted 63 percent of its assets. The other $100,000 came from investors recruited by Postell. Mid South of LA then issued stock to those who had made capital contributions. Two Mid South shareholders contributed their stock, four percent of the total, to the company, and Mid South purchased the remaining 96 percent of the outstanding shares for $6,554,876. Approximately $780,000 was cash and $5,774,876 was in promissory notes bearing interest at the rate of four percent. The two Mid South corporations then merged. The survivor, Mid South, assumed the obligation of paying the promissory notes. Shareholders were then issued new stock. Afterwards, the stock owned by the plan was voted by the members of the administrative committee, who were also members of the board of directors.

Postell had been a prime mover behind the transaction. He received 10 percent of the Mid South stock for personally guaranteeing 100 percent of the debt, arranging for a bank to guarantee the first five years of the loan with a letter of credit, and attracting investors outside of the plan, though he paid no cash consideration. Plan participants also guaranteed the debt in an amount equal to 1.5 times the cash taken from their accounts, secured by a pledge of the stock allocated to their plan accounts. Some of the outside investors did not guarantee debt. As a result of the arrangement, Postell, his relatives and friends, and two prior shareholders owned a total of 28 percent of Mid South's stock, while the plan owned the remaining 72 percent. As of the end of 1987, J.B. Postell owned at least a beneficial interest in almost 33 percent of Mid South's stock both inside and outside the plan. That total had increased to almost 49 percent by the end of 1989.

By 23 June 1987, Postell and Paul Zimmermann had been named directors of Mid South. On that day, Postell also became president of Mid South, and Zimmermann became treasurer. In the immediate past, Mid South had always named the plan fiduciaries and they were always on the board of directors. In fact, Paul Zimmermann's testimony revealed that in practice, there was little differentiation between activities of the administrative committee and activities of the board of directors. Most decisions affecting the plan were made by board of directors' resolutions. Consistent with past practice, on 3 August 1987, Postell and Zimmermann formally became members of the plan's administrative committee. William Pharr, another board member, became an administrative committee member on 2 November 1987.

In 1989, Mid South issued additional stock at $15 per share in order to pay corporate debt and to purchase real estate for the corporation. Plan participants again consented on an individual basis to purchase stock, and the beneficial interest in stock issued to the plan was proportionally allocated to the accounts of those participants who had given consent. Conner purchased an additional $8,910 of the stock.

No independent or written appraisal of Mid South stock's value by the administrator

1. The parties stipulated that Mid South Insurance Agency of Louisiana, Inc. had such commonality of purpose, business and ownership that for practical purposes, it is identical to Mid South.

or trustees of the plan occurred in connection with either the 1987 or 1989 deals. In the process of fixing a price for the company in 1987, Postell testified that he considered likely future cash flows for the company under various conservative scenarios. Postell had arranged or been involved with Mid South's prior acquisition of over 20 independent insurance agencies, and he had considerable practical experience with agency sales and acquisitions. After considering Mid South's likely future cash flow, he and the sellers negotiated a price based upon the amount of debt they thought the company could service. No serious attempt to value the stock occurred in 1989.

One participant withdrew from the plan in 1989, and the plan distributed $14.14 per share to his account. This was an amount equal to the amount of cash originally taken from his account in the plan to purchase the stock. Mid South sold stock to plan participants that year for $15 per share.

Conner's employment with Mid South ended on 1 June 1990. At this time, the plan had no written claims procedure. His plan funds were placed in a segregated account, and when he asked how large a disbursement he would receive from the plan based on the amount of stock he owned, Conner was offered a dollar amount equivalent to that which he had paid for Mid South stock in 1987 and 1989.

After consulting with an accountant in August 1990, Conner requested a "[s]implified description of how the plan works." Mid South's attorney, Michael Roach, responded that a simplified description appeared in the summary plan description (SPD). In 1985 Mid South had distributed to plan participants what purported to be SPDs with cover letters and enrollment forms. Though Conner testified that he had not received a SPD at that time, evidence and admissions developed during cross examination established that he had received the accompanying documents.

Conner then requested a SPD in letters dated 12 March 1991 and 15 May 1991. After informing Conner that he was having difficulty locating the information requested, Roach finally provided a SPD on 4 June 1991. In a letter of the same date, Roach indicated that he had recently drafted the document himself.

Eddie Conner filed this suit on 15 January 1992, and the court held a bench trial which began on 21 August 1995. Defendants include Mid South Insurance Agency, Inc., Mid South Insurance Agency, Inc. Employee's Thrift Plan, and J.B. Postell and Paul G. Zimmermann as Trustees of the Mid South Insurance Agency, Inc. Employee's Thrift Plan, and Aetna Insurance Company.

Conner makes two sets of claims. First, he argues that the 1987 and 1989 stock transactions were prohibited transactions under 29 U.S.C. § 1106. Second, he argues that the plan's fiduciaries failed to perform various duties prescribed under ERISA both in conjunction with the stock transactions and in the conduct of other administrative activities. The defendants contest the merits of those claims and assert that some are time barred. In particular, they argue that even if the stock transactions were otherwise prohibited and the fiduciaries failed to perform some of their duties, they are exempted from liability, because the plan paid no more than adequate consideration for the employer securities it received and the plan provided for individual accounts and permitted participants to exercise control over the assets in those accounts.

## II. Limitations

We first address defendants' contention that ERISA's limitations period ran before Conner filed his claims. According to 29 U.S.C. § 1113, fiduciary duty claims under ERISA must be brought by the earlier of:

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, ... or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; ....

Defendants urge that Conner had "actual knowledge" of the breaches at issue in this case more than three years before he filed suit. We disagree.

Recently, the Fifth Circuit Court of Appeals has twice held that the three-year

period will only begin to run when the plaintiff has "actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinion of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Reich v. Lancaster*, 55 F.3d 1034, 1057 (5th Cir.1995) (quoting *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992)); *Maher v. Strachan Shipping Co.*, 68 F.3d 951, 953–55 (5th Cir.1995). The test is stringent and requires "specific knowledge of the actual breach" upon which plaintiff sues. *Lancaster*, 55 F.3d at 1057 (quoting *Brock v. Nellis*, 809 F.2d 753, 755 (11th Cir.1987)). Mere awareness of a particular event or set of facts later revealed as a breach of fiduciary duty is not actual knowledge of material facts which would make up each of the elements in a complex ERISA claim. *Maher*, 68 F.3d at 954–55 (claimants must have been aware of the process utilized in choosing an investment to have actual knowledge of the resulting fiduciary duty breach); *Gluck*, 960 F.2d at 1178. Without more, the six-year limitations period applies and begins to run on the date of the last action which constituted a breach or violation. 29 U.S.C. § 1113.

■ Defendants have not produced sufficient evidence to show that Conner had "specific knowledge" of the breaches upon which he sued more than three years before filing his action on 15 January 1992. As defendants rightly point out, Conner certainly knew many details of the stock sales in 1987;[2] he was, after all, an active participant in them. Yet, we cannot agree that the quality and quantity of his knowledge meet the stringent requirement of ERISA's actual knowledge test. There is no evidence that Conner had knowledge that the negotiation process in 1987 or other fiduciary conduct between 1987 and January 1989 might have been improper. In fact, defendants do not seriously argue that Conner's knowledge goes beyond awareness that the 1987 transaction occurred, and Conner testified that he recognized the impropriety in the transactions only when he sought advice from an accountant in 1990. To the extent that Conner did have actual knowledge in 1990, the three-year period would not bar his claims filed in January 1992.

*Maher* suggests, but does not hold, that knowledge of events constituting a *per se* breach of ERISA might trigger the three-year period, 68 F.3d at 955–56 n. 4, but the transactions in this case are not *per se* breaches. Under 29 U.S.C. § 1106, the prohibited transactions rules are specifically limited by the exemptions listed in 29 U.S.C. § 1108, one of which defendants assert in this case.[3] The six-year period applies. Since the 1987 stock sale had not even occurred six years before Conner filed suit, his claims are not time barred.

### III. Who are the fiduciaries?

As this case concerns numerous allegations of fiduciary duty breaches, we pause to consider next who among the defendants were fiduciaries to the plan. There is no dispute that Mid South itself was a fiduciary as plan administrator. *McDonald v. Provident*, 60 F.3d 234, 236 (5th Cir.1995); *Donovan v. Mercer*, 747 F.2d 304, 309 (5th Cir.1984). The parties have also stipulated that J.B. Postell and Paul Zimmermann became formal fiduciaries to the plan on 3 August 1987. *See also McDonald*, 60 F.3d at 237. The contentious issue is whether Postell became a fiduciary *before* June 1987.

■ According to ERISA:

a person is a fiduciary with respect to a plan to the extent, (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, . . . .

2. Activities surrounding the 1989 stock transaction would have occurred within the three-year period, so it is not necessary to determine whether Connor had actual knowledge of breaches pursuant to that transaction.

3. Section § 1106(a) states that "[e]xcept as provided in section 1108 [29 U.S.C. § 1108] . . ." the list of transactions which follows are prohibited. The transactions listed in § 1106 are not prohibited if one of the provisions in § 1108 applies.

29 U.S.C. § 1002(21)(A). The Fifth Circuit Court of Appeals has directed that "fiduciary" be given a liberal construction in keeping with ERISA's remedial purpose and that an objective standard should be applied to determine if a particular person is a fiduciary. *Lancaster*, 55 F.3d at 1046.

The Fifth Circuit has held on several occasions that professional financial advisors [4] exercise sufficient authority or control over plan assets to become ERISA fiduciaries if they usurp or cause the trustees to relinquish their independent discretion and to follow the course urged by the financial advisors. *Schloegel v. Boswell*, 994 F.2d 266, 271–72 (5th Cir.1993); *Lancaster*, 55 F.3d at 1047–48. Not all influential advisors are fiduciaries, but, in some situations, an advisor's influence may become so great as to render that advisor a fiduciary. *Lancaster*, 55 F.3d at 1048. If an advisor merely makes an investment proposal, that does not confer fiduciary status. But, if he makes an investment decision, fiduciary status is likely to be present. *Schloegel*, 994 F.2d at 272; *see also, Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir.1991) ("discretionary authority" or "control" connotes actual decision-making power rather than mere influence over the decisions of others).

As well as exercising discretionary authority or control over plan assets, rendering investment advice for a fee or other compensation is also a red-flag characteristic of an ERISA fiduciary. 29 U.S.C. § 1002(21)(A)(ii). Even if a person is not a professional financial advisor as such, but still recommends, designs, and implements schemes, for a fee, to dispose of plan assets, he is likely to be considered a fiduciary. *See Eaves v. Penn*, 587 F.2d 453, 458 (10th Cir. 1987) (by rendering advice on transactions and causing plan to be amended in order to accomplish those transactions, defendant became sole owner with complete control over company's activities, chairman of the board of directors, vice president and treasurer of company and member of the plan committee and was found a fiduciary during conduct of transaction). The Fifth Circuit's professional advisor cases respect this principle.

*Lancaster* illuminates and incorporates both legal principles. Defendant Lancaster was an insurance agent hired to provide insurance services and advice to an employee welfare benefit plan. Lancaster provided the trustees of the plan, who were unsophisticated in insurance and thus dependent on his expertise, with misleading information, and they "uncritically accepted his recommendations." *Lancaster*, 55 F.3d at 1048. As a result of Lancaster's advice, the plan purchased insurance it could not afford, and Lancaster received inflated premiums. The Fifth Circuit held that Lancaster had "usurped" the trustees' independent discretion and was exercising authority and control sufficient to render him a plan fiduciary.

*Lancaster* also favorably cited a similar Eighth Circuit decision. It held that a plan's accountants who recommended transactions, structured deals, and provided considerable investment advice were exercising effective control over an ESOP's assets where none of the other corporate insiders had the expertise to do so and where the accountants were using their positions of trust and confidence for personal gain. *Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir.1992). These two cases indicate that where the formal fiduciaries have essentially vacated the field and left it to the alleged de facto fiduciary to dispose of plan assets at will, the alleged fiduciary is in fact a fiduciary and will be held so responsible, particularly where he uses this vacuum for personal gain.

---

**4.** Though these principles have largely been applied in professional advisor cases in the Fifth Circuit, there is no indication that a different standard for "discretionary authority or control" would apply if the defendant were not a *professional* financial advisor employed by the plan. This is particularly true in light of the fact that these cases necessarily encompass indirectly another bellwether of fiduciary status: rendering investment advice for a fee. 29 U.S.C. § 1002(21)(A)(ii). Particularly since so much of the activity at issue in this case involves investment advice and planning investments, we are convinced that the professional advisor cases provide helpful guidance for identifying fiduciary status even where the fiduciary is not technically a professional financial advisor.

Though J.B. Postell's was not the egregious conduct of the *Lancaster* and *Feilen* cases, his relationship with the formal Mid South plan fiduciaries and the other plan participants in coordinating the 1987 stock deal is analogous to those cases. First, though Postell was not a "professional financial advisor" such as a plan accountant, he performed numerous services of the type such advisors perform in order to help the fiduciaries dispose of plan assets. Like the fiduciaries in *Lancaster* and *Feilen*, he played a major role in planning and structuring the 1987 stock transaction and in negotiating between the buying and selling groups. In particular, he provided the formal fiduciaries with an estimated price for the stock based on the debt the company could service which was the key to the establishment of the price.

Second, in the specific context of this transaction, the formal fiduciaries were likely to defer to Postell's judgment. Mid South's shareholders were not active owners. For example, shareholder and company president Willis Noland was not employed at the agency. Thus, the seller-fiduciaries lacked day-to-day insights into the company's activities, and relied on Postell's opinions, both as to how much debt the company could service and the wisdom of the plan's participation. As company vice president and the top administrator on site, Postell was in a unique position as to both the buyers and the sellers. Pharr's testimony indicates that Postell's opinion was influential to him in deciding to invest in Mid South stock. Postell's activities coordinating the transactions should have alerted a reasonable person in his position that he was vested with fiduciary obligations.

Further, the nature of the exchange itself, which required that the plan participate in order to raise sufficient cash for a downpayment, produced a conflict between the formal fiduciaries' duties to the plan and their familial and personal interests. It was Postell who initiated the transaction, and he testified that without the plan's participation, the sale probably would not have occurred. As a result of the conflicts inherent between the buyers and sellers, the formal fiduciaries vacated the field of fiduciary duty and retreated entirely to their roles as potential stock sellers. This "left the field," as it were, to Postell.

Postell was involved when the deal was conceived, and he agreed that the plan should participate in order to make the downpayment. He signed checks to transfer the capital contributions of the plan from the Mid South of LA account to the sellers. He promised plan participants that if they needed to leave the plan, he would find buyers for their stock, a fiduciary function. The attorney he hired to assist in structuring the transaction, Charles Viccellio, testified that Postell was the only person he recalled who "spoke for the purchasing group." Postell was acting for the buyers, which included the plan, and thus he was engaging in conduct normally reserved for plan fiduciaries. Especially since the formal fiduciaries were not engaging in any such activity, we conclude that Postell was effectively exercising discretionary control and authority over the plan's assets.

Postell also received both direct and indirect compensation for his advice and activities in coordinating the bargain, which further confirms his status as a fiduciary. 29 U.S.C. § 1002(21)(A)(ii). Postell was an insider with considerable influence over both the formal fiduciaries and the buyers. It is thus relevant that the stock price and other terms he negotiated were advantageous to him. These include not only the 10 percent stock consideration he received for coordinating the transaction and guaranteeing the debt, but also the plan's participation itself. Postell's was the largest of any employee's account, and by 1990, he owned almost 50 percent of Mid South's stock between his holdings in and outside of the plan. Because of his large account, the plan's participation benefited Postell to a greater extent than other plan participants. As a result of the sale, he became company president, a member of the Board of Directors, a formal plan fiduciary with the power to vote the plan's stock, and the largest individual stockholder other than the plan itself.[5] *Cf., Eaves*, 587

---

5. We are influenced by the argument that Postell

was the largest holder of beneficial interest in the

F.2d at 458. Thus, we conclude that Postell used his position as an insider to his personal benefit. We hold that J.B. Postell became a Mid South plan fiduciary under ERISA from the moment he began negotiating the 1987 stock exchange.

### IV. Prohibited transactions

Plaintiffs established at trial that the 1987 and 1989 stock sales qualify as transactions in which plan fiduciaries may not engage on behalf of the plan for a variety of reasons.[6] 29 U.S.C. §§ 1106–07. The 1987 transaction was prohibited, because: (1) it involved a sale of property between the plan and various parties in interest, such as Mid South itself, the formal fiduciaries, and other large stockholders, 29 U.S.C. § 1106(a–b); (2) it required plan participants to guarantee the debt of Mid South, a party in interest, with pledges of their beneficial interest in the stock, 29 U.S.C. § 1106(a)(1)(B); (3) the guarantees and pledges constituted impermissible use of plan assets for the benefit of the parties in interest, 29 U.S.C. § 1106(a)(1)(D); (4) the plan invested more than 10 percent of its assets in employer securities although the plan document did not explicitly permit the plan to so invest, 29 U.S.C. §§ 1106(a)(1)(E), 1107(a); and (5) the fiduciaries dealt with the assets of the plan in their own individual interests, which were adverse to the plan's interests, 29 U.S.C. 1106(b)(1).

The 1989 transaction was also prohibited, because: (1) it again was a sale of property between the plan and a party in interest, 29 U.S.C. § 1106(a)(1)(A); (2) it permitted Mid South to use the plan's assets for its own benefit to purchase real estate and discharge corporate debt, 29 U.S.C. § 1106(a)(1)(D); and (3) again, the plan impermissibly acquired employer securities, 29 U.S.C. § 1106(a)(1)(E). Unless one of the exemptions in 29 U.S.C. § 1108 is available, these types of transactions are simply prohibited. *Cunningham,* 716 F.2d at 1465.

■ Defendants argued vociferously at trial that an exemption is available, that the stock sales are exempted from ERISA's

"prohibited transactions" rules, because the plan paid "no more than adequate consideration" for the stock. *See* 29 U.S.C. § 1108(e)(1). If this "adequate consideration" exemption applies, it is argued that we should not hold the plan's fiduciaries liable for engaging in those transactions.

ERISA defines adequate consideration in the context of a closely held corporation without a generally recognized market as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18)(B). IRS Revenue Ruling 59–60 provides the definition of fair market value used by all the parties: the price for which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under a compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for that asset. Rev.Rul. 59–60; *Estate of Bright v. United States,* 658 F.2d 999, 1005 (5th Cir. 1981). It is defendants' burden to prove that no more than adequate consideration was paid. *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983).

■ Defendants' expert testified that Mid South's fair market value on 27 May 1987 was $6,088,730. Taking into account the favorable payment schedule to which the parties agreed, plus an interest rate consistent with IRS rules and regulations and an adjustment to present value as of the transaction date, defendants' expert estimated the payment price to be $5,183,321.75. After comparing her estimate of fair market value to the price, this sale seems to be favorable for the buyers.

On closer examination, that is not the case. We are skeptical of the methodology used by defendants' expert to estimate Mid South's fair market value. She made adjustments to Mid South's balance sheet and income statement, ostensibly reflecting adjustments a third-party buyer might have made, and produced various "pro forma" income statements and balance sheets. With the numbers on

---

stock, as beneficial interest in the plan's stock was divided among numerous plan participants.

6. Defendants did not seriously contest this aspect of plaintiff's case at trial.

the pro forma financial statements, she computed both the company's tangible net worth and the value of operations. Our concern is with the convenient assumptions used to develop the pro forma statements. For example, she assumed that Mid South could cut many of its operating costs after the sale. This in fact it did, but she also assumed that those cuts could occur immediately, which they did not. Plaintiff's expert agreed that adjustments to expenses were in order and accounted for some in his appraisal, but he believed that the cuts could not be made immediately and that the cash flow benefits would only be attainable over a three to five year period. This assessment is realistic, convincing and backed by credible professional analysis. The defendants' estimate lacks credence.

But even if defendants' assumptions are realistic, we do not agree that they mean that the plan paid no more than adequate consideration. The Fifth Circuit has instructed that our adequate consideration analysis should give effect to the fiduciaries' duties listed in 29 U.S.C. § 1104. *Cunningham,* 716 F.2d at 1467. One such duty is that plan fiduciaries must make investments with "the exclusive purpose of: (i) providing benefits to participants and their beneficiaries...."

The amount and security of plan benefits depends in part on the marketability of plan assets. Thus, any fair market value determination should consider the asset's future marketability. This should have been of particular concern with Mid South, a closely held

corporation with no established market for its securities. Defendants' expert did not account for lack of marketability, because her prior experience had been exclusively with plans that had both a put option[7] and a funding mechanism. Thus, the Mid South plan differs significantly from models previously examined by the experts.

Though J.B. Postell testified that he would "find a buyer" for the Mid South stock of participants who left the plan, we nonetheless conclude that the plan's participants faced the infelicities of being noncontrolling owners of a closely held company: they could not be certain of any market for their stock when they wanted or needed to leave the plan. The price paid for the stock may have been appropriate for highly marketable securities, but the individual participants' accounts actually received beneficial interests in small amounts of securities which were not so marketable. Where small interests in closely held corporations are concerned, the whole is simply greater than the sum of the parts, Pythagoras to the contrary notwithstanding. Marketability of the "parts" should have been the primary concern in comparing "value" to "price."

Thus, defendants' expert's testimony that no more than adequate consideration was paid for the firm as a thrift savings plan asset is unconvincing. Plaintiff's expert's uncontroverted and convincing testimony is that a 25 percent discount would have been appropriate in determining the price the buyers should have paid.[8] Using defendants'

---

7. A put option is a negotiable instrument whereby the buyer may demand payment by the writer of a fixed price upon delivery by the buyer of a specified number of shares of a stock. *Gordon v. Board of Governors,* 317 F.Supp. 1045, 1046 (D.Mass.1970). In valuing over 50 ESOPs as well as other plans that acquired employer securities, plaintiff's expert also testified that he had never seen one without a put option or funding mechanism. This had been defendants' expert's experience as well, and causes us to question both the prudence of the transaction and whether the buyers paid no more than adequate consideration.

8. Plaintiff's expert did not use a liquidity discount in his initial valuation, because he was valuing 100 percent of the stock, or in other words, he was determining the fair market value of the entire company as of December 1987.

While we are not convinced that a December 1987 valuation is relevant to this case, the appropriateness of a liquidity discount is a different matter. Plaintiff's expert readily concluded that if asked to focus not on the value of 100 percent of the company to a third-party buyer, but instead on the value of a group of small amounts of stock to plan participants where there was no put option or funding mechanism to buy back stock, he would have applied a 25 percent discount to adjust the value for lack of liquidity. In fact, his report states:

Although a case by case approach must be made in each valuation, it should be understood that anything which adversely affects the liquidity or marketability of the security in question may reduce its value by some degree. Minority positions, blockage discounts, stock restrictions and non-voting status might be

expert's assumptions but also considering plaintiff's recommended liquidity discount, the amount paid for the stock still exceeds fair market value by $0.7 to $1.2 million.[9]

Under these circumstances, we cannot agree that defendants have carried their burden of proving that the plan paid no more than adequate consideration. We hold that the exemption in 29 U.S.C. § 1108(e) from the prohibited transactions liability rules of 29 U.S.C. §§ 1106–07 does not apply in this case.

## V. Fiduciaries duties connected with the stock sales

Next, we consider whether the Mid South plan fiduciaries breached their fiduciary duties pursuant to the stock transactions. According to ERISA:

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

. . . .

### A. Prudence

Neither the fiduciaries in 1987 nor the fiduciaries in 1989 discharged their duties in the stock sales prudently. Prudence requires that the fiduciaries engage in some "independent investigation of the merits of a particular investment." *Cunningham*, 716 F.2d at 1467.[10] Defendants argue that Postell's analysis of future cash flows when fixing a price for the stock fulfills this obligation. We do not agree.

We begin by reiterating our concerns that the plan lacked a put option or funding mechanism to redeem the stock. Even if the fiduciaries had in other ways fulfilled their duty of prudence, failure to provide for the inevitable situation of participants leaving the plan would cause us to question the prudence of the transactions. *See GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729, 732–33 (11th Cir.1990) (fiduciaries violated their duty of prudence where they failed to invest in ways that would provide for known cash flow needs). In any case, the transactions were imprudent for other reasons.

"Merits" of a transaction are meaningless in a vacuum. Whether a plan can pay for an asset is not the only relevant question in evaluating potential plan investments. The opportunity cost of the chosen investment, or the expected return on investments which would be made if the chosen investment was

considered a subset within the general lack of marketability area, since all work to reduce the liquidity or salability of a particular block of stock to some further degree, even beyond the discount inherent in the closely held character of the equity.
Of course, the beneficial interests owned by the plan participants were minority positions, and the participants did not vote their shares. We find plaintiff's expert's analysis of liquidity discounts to be helpful, though he did not apply one in his initial report.

9. In determining the present value of the price paid for the stock, defendants' expert applied a 8.25 percent discount factor and found that the present value for the debt as of June 1987 was $4,575,440. To this can be added the capitalization of Mid South of LA, $956,000 for a total of $5,531,440. Assuming the appropriateness of these calculations, and then adjusting defendants' fair market value range for the liquidity

discount recommended by plaintiff's expert, we calculate a range for the fair market value of $4,375,297.50 to $4,757,797.50. The price paid exceeds all points within the range.

Defendants suggest in their post-trial brief that $956,000 is larger than the true capitalization of Mid South of LA in 1987 by the amount assigned to J.B. Postell's 10 percent of the stock. Even if this is true, it would merely make the total price paid for the stock $5,431,440. That difference is not enough to change the legal conclusion of this analysis, that defendants have not carried their burden of proving that the buyers paid no more than adequate consideration for what they received.

10. A formal independent appraisal would have been one way to do such an investigation, though "independent appraisal is not a magic wand" which discharges the fiduciaries' obligations. *Cunningham*, 716 F.2d at 1474.

not made, is also important. If investment A will yield X dollars and investment B will yield X + 1 dollars, this seriously calls into question investment in A. Not even to consider investment B, however, is certainly imprudent. *Cf. GIW Industries, Inc.,* 895 F.2d at 732–33 (where fiduciary invested primarily in long-term savings bonds, a generally sound investment, but a more diverse set of investments would have better satisfied plan's cash flow needs, the savings bond investments were imprudent).

In this case, the fiduciaries never determined the likely return on the Mid South stock investment or whether that return compared favorably with other investments. In other words, they had no idea whether investment A would yield X dollars or X + 1 dollars based on the price paid nor whether investment B would yield X, X + 1 or X + 2 dollars. There was no comparative investment analysis. Particularly in this case where so many parties in interest were involved and sound business judgment may have been clouded, the fiduciaries should have compared the return from this investment with other reasonable investments. It is the fiduciary's role to "keep your head when all about you are losing theirs."[11] We conclude that the plan's fiduciaries simply did not fulfill their duties in this regard.

### B. Exclusive purpose

Both J.B. Postell and Paul Zimmermann testified frankly that providing benefits to participants was *not* the exclusive purpose of either transaction. Therefore we hold that the fiduciaries violated this duty as well.

### C. Participant–Directed Account Exception

■■■ Defendants argue that they are insulated from liability for their duty breaches because the Mid South plan provided for individual accounts and permitted the participants to exercise control over the assets in those accounts, which Eddie Conner in fact exercised. *See* 29 U.S.C. § 1104(c). We do not agree.

According to 29 U.S.C. § 1104(c):

In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over assets in his account, if a participant or beneficiary exercise control over the assets in his account.... (2) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.

Plaintiff agrees that the Mid South plan provides for individual accounts and that he did in fact exercise some degree of control over his assets when he decided to purchase the Mid South stock. Whether this exempts the plan fiduciaries from liability for their violations of the exclusive purpose and prudence rules depends on the scope of the statutory language.

No regulations to flesh out the scope of the "participant directed accounts" exception had been proposed by June 1987 or adopted by 1989. Our decision is controlled by nothing but ERISA's language.[12] Yet, the proposed and final regulations are similar in pertinent parts and do provide guidance to the content of terms such as "to exercise" and "control."

**11.** Rudyard Kipling, *If . . .,* in Rewards and Fairies (1910) ("If you can keep your head when all about you/Are losing theirs and blaming it on you; . . . you'll be a Man, my son!"). In this spirit, it is not enough to argue, as defendants do, that the plan's participants willingly paid the price Postell computed. As plaintiff's expert explained, fair market value is distinguishable from the price that a particular buyer may be willing to pay to a particular seller. For example, one particular buyer, William Pharr, testified that he wanted to become a Mid South owner in order to improve his job security. Yet, that concern would not affect the value of the company to a third party. Thus, the price Pharr was personally willing to pay does not bear any relationship to likely resale value and does not provide a barometer of value as compared to other possible investments. In any case, the fiduciaries' exclusive concern should have been to enhance participant benefits, not provide for employee ownership of the firm. Though the employees may have been enthused about buying the firm for which they worked, as we state above it is a fiduciary's job to keep his head while those around him are losing theirs.

**12.** There is also a paucity of case law addressing the provision.

For example, the proposed and adopted regulations have consistently required that participants in participant-directed account plans have a reasonable opportunity to give investment instructions that the plan fiduciary is obligated to follow. *See* 29 C.F.R. § 2550.404c–1(b)(2); Joseph R. Simone, *Current Issues Under Department of Labor Proposed Regulations, in* Practicing Law Institute, Employee Benefits Regulatory Update, 1989 (Tax Law and Practice Course Handbook Series 1989). In the Mid South plan, however, participants do not appear to have had any opportunity to instruct the fiduciaries to *sell* the Mid South securities. Mid South stock is not among the "investment funds" listed in the plan document to which participants may allocate their plan assets. Further, participants were permitted to change only the allocation of future, not past assets, so Mid South stock owners could not adjust their portfolios to decrease the amount of Mid South stock included. Finally, even if participants had the paper authority to switch their investments from Mid South stock to another fund, no market existed for the stock, and none was promised. Even if a participant had directed the trustees to sell his stock, we cannot find that they were obligated to carry out that request. Apparently, plan participants had control over their plan assets only to the extent that they wanted to buy, but not sell Mid South stock. Even in the absence of the regulations, we would not agree that the power only to buy constitutes "control," but the "reasonable opportunity" language laced throughout the proposed and final regulations further convinces us that the exemption should not apply.

Lack of a market for closely held employer securities may partly explain why the proposed and adopted regulations frown upon offering employer securities as an investment option in a participant directed account plan at all. Under the 1987 proposed regulations, no employer securities offerings were permitted, though the 1992 regulations do permit plans to offer publicly traded or other oft-traded securities as an option. *See* 29 C.F.R. § 2550.404c–1(c)(2)(ii)(E)(*4*)(*iii*); Howard Pianko & Orrin Feldman, *Participant Directed Individual Account Plans Under ERISA Section 404(c), in* Practicing Law Institute, Pension Plan Investments: Confronting Today's Legal Issues (Tax Law and Estate Planning Course Handbook Series 1991). The Mid South stock sales would have violated these rules. Further, the current and most previous proposed regulations also would have required that the stock's voting rights pass through to the plan participants, but under the Mid South plan, the trustees voted the Mid South stock owned by plan accounts. 29 C.F.R. § 2550.404c–1(c)(2)(ii)(E)(*4*)(*iii*); Pianko & Feldman, *supra.*

Finally, the regulations require that plan fiduciaries provide some disclosure, at least to the extent of making sure that the plan documents explain that the plan is participant directed, subject to ERISA, and that the plan fiduciaries are not liable for participant-directed investments which evaporate. Fiduciaries should also provide descriptions of investment alternatives as well as the likely risk and return on each. 29 C.F.R. § 2550.404c–1(b)(2). Defendants have not directed the court to these types of explanations and disclaimers; our review of the plan documents convinces us they do not exist.

The Mid South plan bears virtually no resemblance to the plans envisioned in the proposed and final regulations. These regulations do not control our decision, of course, but along with the statutory language itself, they do persuade us that Mid South's plan does not fit into the scope of the exemption as it would have been commonly understood at the time of the bargains. The Mid South plan's fiduciaries are not entitled to its protection.

## VI. Fiduciary liability

Conner presented a litany of fiduciary duty breaches by Mid South in administration of the plan. We hold that Mid South breached its duty of appointment when it failed to replace interested fiduciaries with independent fiduciaries during the negotiations over the 1987 stock deal; all the fiduciaries breached their duties to abide by plan documents that require them to make regular determinations of the fair market value of plan assets; they also breached statutory

duties to file regular reports with various agencies as required by federal law, *e.g.* 29 U.S.C. § 1023; and it is apparent that all the fiduciaries, except for Paul Zimmermann, breached duties of loyalty and care in both 1987 and 1989, because they permitted the plan to engage in illegal transactions. We hold that J.B. Postell's conduct during the negotiations of the 1987 stock deal violated his duty of loyalty as a fiduciary to the plan, since he was an interested party in the transaction. 29 U.S.C. § 1002(14)(H).

Defendants do not contest these assertions and they are amply supported in law and with facts in the record. The fiduciaries are personally liable to the plan for these breaches. 29 U.S.C. § 1109(a). We hold that they are also jointly and severally liable.

The disputed issue involves the extent of Paul Zimmermann's liability. Zimmermann became a formal fiduciary in August 1987 after the overwhelming majority of the 1987 stock transaction had been concluded. From Zimmermann's testimony and exhibits filed into evidence at trial, the court finds that even after he became a formal fiduciary, he participated in aspects of the transaction. These include the merger of Mid South of LA into Mid South, the distribution of stock to the Mid South of LA shareholders, and activities concerning the debt guarantees. Many of these activities were prohibited themselves or were directly related to prohibited transactions. Thus, we hold that Zimmermann is liable on the basis of his own activity for permitting the plan to engage in prohibited transactions, without which the sale would never have occurred. 29 U.S.C. § 1106; *see also Free v. Briody*, 732 F.2d 1331, 1335 (7th Cir.1984). He is also jointly and severally liable for the fiduciary breaches pertaining to the 1989 transaction.

Whether Zimmermann may be held jointly and severally liable for J.B. Postell's and Mid South's breaches of duty which occurred before he became a formal fiduciary is a different matter. He may not be held liable with respect to a breach of duty which occurred before he became a fiduciary, 29 U.S.C. § 1109(b), but he may be held liable for failing to make reasonable efforts to remedy those breaches of which he had actual knowledge. 29 U.S.C. § 1105(a)(3); *Cunningham*, 716 F.2d at 1474–75. There is no question that Zimmermann did nothing to remedy the breaches of Postell or his predecessor fiduciaries. Therefore, we consider whether he also had actual knowledge of those breaches.

Again, the Fifth Circuit's actual knowledge test is stringent. According to *Cunningham:*

> Section 405 does not impose vicarious liability—it requires actual knowledge by the co-fiduciary. "Under this rule, the fiduciary must know the other person is a fiduciary with respect to the plan, must know that he participated in the act that constituted a breach; and must know that it was a breach."

716 F.2d at 1475 (quoting H.R.Rep. No. 1280, 1974 U.S.C.C.A.N. at 5080). Though the Fifth Circuit did not apply this test in *Cunningham* due to the lack of a factual record, this court concludes that the test is every bit as rigorous as the test for actual knowledge in the limitations context discussed earlier. A rigorous test is necessary to avoid running afoul of ERISA's rule that fiduciaries will not be held liable with respect to duty breaches which occur before they become fiduciaries. 29 U.S.C. § 1109(b).[13]

We hold, therefore, that Paul Zimmermann is not liable for failing to remedy J.B. Postell's breaches of duty prior to 3 August 1987, because he did not have actual knowledge that Postell was a fiduciary.[14] Though we

---

**13.** The actual knowledge requirement insures that § 1105 will not be used to impose vicarious liability of the type § 1109 frowns upon but will only be used in the specific cases outlined in the section, such as the failure to take reasonable steps to remedy a breach. We note that a reasonableness test would have the tendency to collapse into vicarious liability, which both § 1109 and the Fifth Circuit's caselaw forbid.

**14.** Note that this need not disturb our holding that Postell himself is liable as a fiduciary, because the Fifth Circuit held in *Lancaster* that an objective standard should be applied to determine if a particular person shall be held liable for his own fiduciary duty breaches, 55 F.3d at 1046, while Zimmermann may not be held liable for a predecessor fiduciary's breaches unless he has subjective knowledge that the other party is a fiduciary. *Cunningham*, 716 F.2d at 1475. This

hold Postell was a fiduciary, we do not believe this was sufficiently obvious to render a successor fiduciary, such as Zimmermann, liable for failing to remedy his breaches. On the other hand, Zimmermann could not have failed to notice that the formal fiduciaries, such as Mid South, had violated the exclusive purpose and prudence rules, and that they had engaged in prohibited transactions. We do not agree that the Fifth Circuit's test is so strict as to require a showing that Zimmermann had read and understood 29 U.S.C. §§ 1104–09 to be liable for failure to remedy, and in any case, common law rules well known to businessmen and corporate officers must have alerted him to the conflicts of interest between the formal fiduciaries' roles as sellers and fiduciaries in the transaction. We hold that he is liable for failure to remedy those breaches,[15] and his liability is joint and several with that of the other fiduciaries.

### VII. Summary plan descriptions

■ Conner's final ground for relief involves the inadequacy of Mid South's summary plan descriptions. The Fifth Circuit has announced a strict test for determining if a document is an SPD under ERISA. The document must contain "all or substantially all" of the information required according to statute and the Labor Department's regulations. *Hicks v. Fleming Companies, Inc.,* 961 F.2d 537, 542 (5th Cir.1992). As the court explained in *Hicks,* a document which "due to inadvertence, omits some small item of required information" could constitute a SPD, but "such a case would be the exception, not the rule." *Id.* at 542 n. 17. The court chose to adopt a bright-line test for the protection of both employers and employees, so that no document could be afforded the legal effects of an SPD, such as conferring benefits at variance with the terms of the plan, unless it were sufficient to be accepted for filing and publication by the Secretary of Labor. *Id.* at 542.

■ Review of Mid South's 1985 and 1991 "SPDs" convinces us that they do not pass the Fifth Circuit's extremely strict test.

The 1985 document lacks numerous elements from the list in 29 C.F.R. § 2520.102–3, including certain items particularly relevant to this litigation, such as the trustees' names, addresses and phone numbers, the agent for service, the claims procedure and a statement of ERISA rights. Though the 1991 document contains more information, it again fails to list the trustees' names, addresses and phone numbers or the name, address and phone number of the administrator. Among other omissions and errors, it describes a pooled account arrangement, though the plan document provides for individual accounts. Further, Mid South does not appear to have filed either of these purported SPDs with the Department of Labor as required by 29 C.F.R. § 2520.104a–3. Thus, we hold that neither the 1985 nor the 1991 document qualifies as an SPD.

### VIII. Relief

■ The transactions through which Eddie Conner purchased Mid South stock as a plan participant should not have occurred. If the fiduciaries had performed their duties properly, Conner's plan contributions would have been invested in one or a combination of the plan's funds or some alternate fund they might have established, not Mid South stock. Therefore, Conner should receive the amount of his 1987 and 1989 investments as well as prejudgment interest based on the return on alternate investments in such an employee benefit plan during the same period that Conner's funds were invested in Mid South stock. *See Schloegel v. Boswell,* 800 F.Supp. 468, 475 (S.D.Miss.1992); *Donovan v. Bierwirth,* 754 F.2d 1049, 1057 (2d Cir.1985) (burden of showing that funds would have earned less than the most profitable of alternate plausible investment strategies is on defendants).

One of plaintiff's experts testified that for the period 1987 through 1990, a reasonable rate of return for assets in single employer defined contribution plans was 12.6 percent per year. Defendants do not contest this testimony. Thus, Conner should receive the amounts he paid for the stock in both 1987

---

is merely another example of the differences between objective and subjective standards.

**15.** We note that our second holding is not likely to affect the dollar amount of Zimmermann's liability in any case.

and 1989 plus 12.6 percent interest compounded to reflect the growth of the principal had it been invested in an average employer defined contribution plan from 19 June 1987, the day after the transaction was essentially completed, through 1 June 1990, when Conner's employment with Mid South terminated.

Conner is entitled to further prejudgment interest at the rate for fifty-two week treasury bills auctioned at the auction immediately preceding 7 August 1990, compounded annually. *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1219 (8th Cir. 1981) (applying post-judgment interest rate as described in 28 U.S.C. § 1961(a) to prejudgment interest ERISA case); *Kay v. Thrift and Profit Sharing Plan*, 780 F.Supp. 1447, 1462 (E.D.Pa.1991) (following *Dependahl* as the "leading case" in the ERISA prejudgment interest area; *see also Life Insurance Co. of North America v. Hunter*, 782 F.Supp. 47, 50 (E.D.La.1992) (favorably citing *Dependahl* ). We also award $15,000 in statutory penalties under 29 U.S.C. § 1132(c) in light of Mid South's failure to provide legally sufficient SPDs. Finally, we award plaintiff reasonable attorneys fees and costs accrued during this action. *See* 29 U.S.C. § 1132(g)(1); *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980) (leaving decision to award attorneys fees in ERISA cases to the discretion of the trial judge). The numerous breaches of duty, the complete inappropriateness of the transactions, and the failure of fiduciaries to be aware of the existence, let alone the gravity, of their responsibilities all cry out for an attorney fee award in this case. *Id.*

It is recommended that the plaintiff submit a judgment reflecting the court's reasoning. The parties have stipulated that Conner should have been 100 percent vested in the plan when he left Mid South; the judgment shall indicate this. Plaintiff's counsel shall also provide the court with time sheets and other records sufficient to support the attorney fee and costs award in the proposed judgment.