In re COMPUTER SCIENCES CORP.
ERISA LITIGATION.

This Document Relates
To: All Actions.

Nos. CV 08–02398 SJO (JWJx),
CV 08–02409 SJO (JWJx).

United States District Court,
C.D. California.

July 13, 2009.

Edwin J. Mills, James E. Lahm, Jules Brody, Mark Levine, Melissa R. Emert, Michael J. Klein, Patrick K. Slyne, Stull Stull and Brody, New York, NY, Patrice L. Bishop, Stull Stull and Brody, Los Angeles, CA, for Plaintiffs.

Brenda Lynn Kleidosty, Dean J. Kitchens, Michael M. Farhang, Jeremy W. Stamelman, Gibson Dunn & Crutcher LLP, Los Angeles, CA, Charles C. Jackson, Deborah S. Davidson, Thomas F. Hurka, Morgan Lewis and Bockius LLP, Chicago, IL, D. Ward Kallstrom, Donald P. Sullivan, Morgan Lewis and Bockius LLP, San Francisco, CA, Jennifer Schulp, Paul

Blankenstein, Nicole A. Diller, Gibson Dunn and Crutcher LLP, Washington, DC, Lee G. Dunst, Gibson Dunn and Crutcher LLP, New York, NY, for Defendants.

## ORDER DENYING PLAINTIFFS' AMENDED PARTIAL MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Docket Nos. 108, 130].

S. JAMES OTERO, District Judge.

This matter is before the Court on Plaintiffs Federico Quan, Walter Gray, Don Tyrone Ballard and Jeanine L. Shamaly's (collectively "Plaintiffs") Amended Motion for Partial Summary Judgment, filed May 8, 2009, and Defendants Computer Sciences Corporation ("CSC")[1], CSC Retirement Plans Committee (the "Committee"), Leon J. Level, Hayward D. Fisk, Frederick E. Vollrath, Donald G. DeBuck, Michael E. Keane, and Nathan Siekierka, Van B. Honeycutt, Irving W. Bailey II, F. Warren McFarlan, and Thomas H. Patrick's (collectively "Defendants") Motion for Summary Judgment, filed May 4, 2009. Oppositions and Replies have been filed for both Motions. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for June 1, 2009. *See* Fed. R. Civ. R. 78(b). For the following reasons, the Court DENIES Plaintiffs' Amended Motion for Partial Summary Judgment, and GRANTS Defendants' Motion for Summary Judgment.

## I. *BACKGROUND*

CSC offers its employees the benefit of participating in the CSC Matched Asset Plan (the "Plan"), a 401(k) defined contribution plan governed by the Employee Retirement Income Security Act ("ERISA"). Under the Plan, CSC employees can invest a percentage of their monthly compensation in various investment options, including the CSC Stock Fund. The Plan requires that CSC stock be offered as an investment option. (*See* 2005 and 2007 Amendment and Restatement of Plan, filed as DeBuck Decl. Exs. F, I, §§ 2.29, 7.1, 7.2.) The CSC Employee Handbook provides information about investing in the CSC Stock Fund, and explicitly states that "[t]his fund does not represent a diversified equity portfolio as the Fund is only invested in one stock." (Employee Handbook, filed as DeBuck Decl. Ex. G, at 8–10.) Plaintiffs are current and former CSC employees who participated in the Plan and invested in the CSC Stock Fund.

In June 2005, CSC provided a proxy statement to Plan participants stating that "[a]ll options currently granted have an exercise price equal to 100% of the market value on the option grant date." (Proxy Statement, filed as Bishop Decl. Ex. 2, at 6.) Subsequently, the Securities and Exchange Commission ("SEC") investigated CSC and other companies for "backdating" stock options granted to management. On June 29, 2006, CSC announced that the SEC had made an "informal request for information related to CSC's stock option grants and stock option practices," and that CSC was initiating a $2 billion stock buy back. (June 29, 2006 News Release, filed as DeBuck Decl. Ex. B.) The following day, the price of CSC stock declined 12%. The stock dropped from $55.88 to $48.56. (Bishop Decl. Ex. 6, Bates No. 00073; Garrett Decl. ¶ 13; Garret Decl. Ex. 3A at 37.) Plaintiffs claim that the

---

[1]. CSC is an information technology company, listed as number 170 on the 2008 Fortune 500 list, with approximately $16.5 billion in revenues in fiscal year 2008. (DeBuck Decl. ¶¶ 3, 7.) As of March 2008, CSC had approximately 89,000 employees. (2008 Form 10–K, filed as DeBuck Decl. Ex. A, at 14.)

June 29, 2006 announcement regarding the SEC request was the sole cause of the June 30, 2006 drop in share value. Defendants admit that this stock fluctuation is statistically significant. (*See* Garrett Decl. ¶ 13.) Defendants claim, however, that Plaintiffs have nevertheless failed to establish a causal link between the June 2006 announcement and the drop in stock price. An internal CSC investigation found that "9,234 stock option grants should be modified, principally due to delays in authorization and approval and the absence of definitive documentation,"[2] and that "tax benefits associated with the exercise of certain stock options in foreign jurisdictions had been incorrectly credited." (Bishop Decl. Ex. 3.) As the SEC's Office of the Chief Accountant has acknowledged, prior to September 19, 2006 there was some confusion regarding how to calculate the measurement date of stock option grants, and multiple companies engaged in practices similar to CSC. (*See* Sept. 19, 2006 Office of Chief Accountant Guidance Letter, filed as Dooley Decl. in Support of Defs.' Opp'n Ex. D, at ¶ D.) To resolve this confusion, on September 19, 2006 the SEC Office of the Chief Accountant issued a guidance letter, at which point CSC determined that the stock option grants required adjustment. *Id.*; DeBuck Decl. ¶ 16. The SEC closed its investigation of CSC without initiating any action against CSC. *Id.* ¶ 20.

Based on this alleged backdating and other imprudent mismanagement, Plaintiffs filed suit against Defendants. In ad-dition to the instant action, Plaintiffs' counsel launched investigations of over 50 other companies being questioned by the SEC for their stock option granting practices, and filed several other lawsuits based on the same allegations as those here. *See Stull, Stull & Brody Announces Commencement of Lawsuit Against Computer Sciences Corp. for the Back–Dating of Stock Option Grants,* June 22, 2006, *available at* http://www.ssbny.com/filedcases/csc.html. Here, Plaintiffs, on behalf of a class of Plan participants (the "Class"),[3] allege that Defendants breached the fiduciary duties imposed by ERISA § 404(a) by: (1) imprudently investing Plan assets in CSC stock; (2) negligently misrepresenting and failing to disclose material information about CSC's finances and operations; and (3) failing to properly appoint, monitor, and inform the Committee and its members. Plaintiffs now move for summary judgment on the first two claims against the Committee and Mr. Level, CSC's Vice President and Chief Financial Officer, and Defendants move for summary judgment on all claims.

## II. *DISCUSSION*

The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact for trial. *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A "material" fact is one that could affect the outcome of the case, and an issue of mate-

---

**2.** Plaintiffs do not provide information regarding the number of shares implicated in these 9,234 stock option grants.

**3.** The Class is defined as "all participants in the Plan for whose individual accounts the Plan held shares of the common stock of Computer Sciences Corporation as part of the Company Stock Fund or CSC Stock Fund investment option in the Plan, at any time between December 31, 1998 and January 23, 2008, inclusive (the 'Class' and 'Class Period,' respectively.') Excluded from the Class are Defendants; members of the Individual Defendants immediate families; and directors and/or senior officers of Computer Sciences Corporation; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns."

rial fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, courts view the evidence in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

Under ERISA, "a person is a fiduciary with respect to a plan to the extent: (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002. Plan fiduciaries are required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." *Id.* § 1104(a)(1). Plan fiduciaries must administer a plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). In addition, fiduciaries must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *Id.* § 1104(a)(1)(D).

### A. *Investment in CSC Common Stock*

The so-called *"Moench* presumption," which the Ninth Circuit "has not yet adopted," provides that "fiduciaries of employee stock ownership plans are presumed to have acted consistently with ERISA in their decisions to invest assets in employer stock." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1102 (9th Cir.2008) (citing *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir.1995)). The first, fifth, and

sixth circuits have adopted this presumption. *See Bunch v. W.R. Grace & Co.*, 532 F.Supp.2d 283, 289 (D.Mass.2008) (*aff'd* by 555 F.3d 1 (1st Cir.2009); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir.2008); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir.1995)). The rationale behind this presumption is that "employee stock ownership plans are designed to invest primarily in qualifying employer securities" (29 U.S.C. § 1107(d)(6)(A)), because they are "devices for expanding the national capital base among employees—an effective merger of the roles of capitalist and worker." *Moench*, 62 F.3d at 568 (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1458 (5th Cir.1983)). To further this goal, Congress "enacted a number of laws designed to encourage employers to set up such plans," and exempted fiduciaries of such plans from a number of duties fiduciaries of traditional pension plans are otherwise subject to, such as the duty to diversify. *See id.* Congress has also stated its concern that "regulations and rulings which treat employee stock ownership plans as conventional retirement plans . . . reduce the freedom of the employee trusts and employers to take the necessary steps to implement the plans, and . . . otherwise block the establishment and success of these plans." *Id.* (citing Tax Reform Act of 1976, Pub.L. No. 94–455, § 803(h)). Thus, the *Moench* presumption recognizes Congress' desire to encourage the creation and success of employee stock ownership plans.

A plaintiff may rebut the *Moench* presumption by "establishing that the fiduciary abused its discretion and a prudent investor under the circumstances would not have followed the plan's mandate to invest in employer securities." *Id.* "Mere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption." *Wright v. Or.*

*Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir.2004) (internal citation omitted). Rather, "a plaintiff must show a *causal link* between the failure to investigate and the harm suffered by the plan." *Id.* (emphasis in original) (internal citation omitted).

If the *Moench* presumption is not applied, courts conduct their prudence analysis under the "prudent man" standard of 29 U.S.C. § 1104(a)(1)(B). *See In re Syncor ERISA Litig.*, 516 F.3d at 1102. The Ninth Circuit has explained that a "myriad of circumstances" could violate the prudent investor standard, such as "where a company's stock did not trend downward over time, but was artificially inflated during that time by an illegal scheme about which the fiduciaries knew or should have known, and then suddenly declined when the scheme was exposed." *Id.*

 Under either the *Moench* presumption or § 1104(a)'s prudent man standard, "while financial viability is a factor to be considered, it is not determinative of whether the fiduciaries failed to act with care, skill, prudence, or diligence." *Id.* (holding district court abused its discretion in granting summary judgment because "there [wa]s a genuine issue whether the fiduciaries breached the prudent man standard by knowing of, and/or participating in, the illegal scheme while continuing to hold and purchase artificially inflated Syncor stock for the ERISA plan"). Moreover, as under the *Moench* presumption, stock price declines are insufficient to indicate that continued investment in such stock is imprudent under § 1104(a). *See* Dep't of Labor Employee Benefits Security Administration Field Assistance Bulletin, 2004–03, at 5 (Dec. 17, 2004) (*available at* http://www.dol.gov/ebsa/regs/fab_2004–3.html) (noting that "because stock prices fluctuate as a matter of course, even a steep drop in a stock's price would not, in and of itself, indicate that a named fiducia-ry's direction to purchase or hold such stock is imprudent").

 In analyzing claims of fiduciary imprudence, "the focus of the inquiry is 'how the fiduciary acted,' not whether his investments succeeded or failed." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir.2008) (internal citations omitted). Further, courts view alleged imprudence "in light of the character and aims of the particular type of plan" the fiduciary serves; when, like here, retirement plans are at issue, courts are mindful of "the 'long-term horizon of retirement investing,' as well as the 'favored status Congress has granted to employee stock investments in their own companies.'" *Id.* (citing *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 308 (5th Cir.2007); *Varity v. Howe*, 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)).

### 1. *Imprudence*

 Plaintiffs argue that there is "no genuine disputed issue of material fact that CSC common stock was not a prudent investment for the retirement savings account plan" because CSC's lack of internal controls over the stock option program "led to a SEC investigation and a significant diminution in the value of CSC common stock." (Pls.' Mem. P. & A. 11.) In support, they cite CSC's June 29, 2006 announcement that the SEC made an "informal request for information related to CSC's stock option grants and stock option practices." (*See* Bishop Decl. Ex. 6; Garrett Decl. ¶ 13.) Plaintiffs also cite a February 2007 public report issued by CSC finding that "9,234 stock option grants should be modified, principally due to delays in authorization and approval and the absence of definitive documentation," and that "tax benefits associated with the exercise of certain stock options in foreign jurisdictions had been incorrectly credit-

ed." (*See* Bishop Decl. Ex. 3.) Further, Plaintiffs argue they suffered loss due to Defendants' imprudent investment in CSC stock because the day after CSC announced that the SEC had requested information from it regarding the stock option program, CSC stock prices dropped 12%. (*See* Bishop Decl. Ex. 6, Bates No. 00073.) Although Plaintiffs state in their responses to Defendants' interrogatories that "by no later than the first day of the class period, [D]efendants should have been aware of the Company's lack of internal controls," and that continuing to offer CSC stock as an investment option became imprudent at this time, they fail to sufficiently explain why Defendants should have known of alleged lack of controls at this time, and why continued investment was imprudent. (*See* Pls.' Second Supplemental Response to Defendants First Set of Interrogatories, filed as Blankenstein Decl. Ex. A, Nos. 16, 18.) Moreover, the price of CSC stock on December 31, 1998, the first day of the class period, was $64.25, and reached prices of over $95.00 during the class period.[4] (*See* Garrett Decl. Ex. 3A at 5.) Had Defendants stopped offering CSC stock as an investment option in December 1998, as Plaintiffs propose, they may have faced lawsuits for doing so when the stock price later rose. *See Kirschbaum,* 526 F.3d at 256 (noting that plan fiduciaries may face liability for removing company stock as a plan investment option during a stock price decline if the stock later rebounds).

Plaintiffs support their claim of backdating by noting that Vollrath, CSC's Corporate Vice President of Human Resources, admitted that he tried to "do the right thing for the employees" by changing the stock option grant dates from time to time. (Vollrath Dep., filed as Bishop Decl. Ex. 22, 171:4–172:11.) Plaintiffs also allege

that a "deficiency in [CSC]'s tax department" resulted in "inaccurate financial statements [which] violated both Generally Accepted Accounting Principles ("GAAP") and disclosure rules and included misreporting of the Company's tax liabilities." (Pls.' Mem. P. & A. 14, citing Dec. 6, 2004 Audit Committee Minutes ("Minutes"), filed as Bishop Decl. Ex. 27.) However, the Minutes state only: (1) that Dooley "highlighted" slides entitled "Potential Significant Deficiencies" and "Remediation Statutes: Deficiencies and Potential Deficiencies (as of November 19, 2004); (2) that" potential deficiencies represent only 1.6% of all areas tested; and (3) that "many of the potential deficiencies reflect situations where controls are effective, but documentation is deficient." (Minutes at 3.) Plaintiffs cryptically argue that the Committee was aware of and ignored deficiencies, but fail to identify any specific deficiencies or violations of GAAP. (Pls.' Mem. P. & A. 14).

Lastly, Plaintiffs allege that Defendants breached their duty of loyalty by "locking Plan participants into CSC stock throughout most of the participants' employment by the Company." (Pls.' Mem. P. & A. 14.) They note that Plan participants were informed that "[n]ew company matching contribution will be invested automatically in the CSC Stock fund. Upon reaching age 55 with five years of service, or at age 59 and a half regardless of service, you may elect to move the value of company matching contributions to any of the other [Plan] funds." ("Matrix Call Guide," filed as Bishop Decl. Ex. 9, at 3; DeBuck Decl. ¶ 26.) This restriction remained in place until January 1, 2007. (DeBuck Decl. ¶ 27.) Plaintiffs fail to support their bare assertion that this matching program violated Defendants' duty of loyalty with any case law, regulation, advi-

---

**4.** CSC stock closed above $95.00 on several times in May and June, 2000, and was in the

$70 to $90 from late 1999 through mid–2000. *Id.*

sory opinion, or other rule or law to suggest that this constitutes a breach.

Despite Plaintiffs' arguments that summary judgment in their favor is warranted on their imprudence claim, and that genuine issues of material fact exist as to Defendants' Motion on this claim, Plaintiffs have presented no evidence or argument that Defendants failed to use the care, skill, prudence, and diligence that "a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *See* 29 U.S.C. § 1104(a)(1)(B). Alternatively, Plaintiffs present no evidence or argument that "a prudent investor under the circumstances would not have followed the plan's mandate to invest in employer securities," and thus fail to rebut the *Moench* presumption that Defendants "acted consistently with ERISA in their decisions to invest assets in employer stock." *See In re Syncor ERISA Litig.*, 516 F.3d at 1102; *see also Kirschbaum*, 526 F.3d at 256 (explaining that "one cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from [Plan] provisions. Instead, there ought to be persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest").

Moreover, not only is a decline in stock price insufficient to make continued investment imprudent, (*see* Dep't of Labor Bulletin 2004–03 at 5 (noting that "because stock prices fluctuate as a matter of course, even a steep drop in a stock's price would not, in and of itself, indicate that a named fiduciary's direction to purchase or hold such stock is imprudent"); *Wright*, 360 F.3d at 1099), but holding fiduciaries

liable for continuing to invest in declining stock would place them in an "untenable position," as they could also be liable if they ceased investment in the declining stock and it later rebounded. *See Kirschbaum*, 526 F.3d at 256. Alternatively, "compelling fiduciaries to sell off a plan's holdings of company stock may bring about precisely the result plaintiffs seek to avoid: a drop in the stock price." *Id.* Eliminating CSC stock as an investment option for its employees is a clarion call to the investment world that the Committee lacked confidence in the value of its stock, and could have a catastrophic effect on CSC stock price, severely harming all CSC stock holders, including Plan members. Thus, a prudent investor in Defendants' position would not stop offering CSC stock because doing so could cause a further drop in the stock price, or the stock may later rebound. Because Plaintiffs offer no evidence that a prudent investor under the circumstances would have acted any differently than Defendants, they fail to meet their burden on their Motion, and fail to raise genuine issues of material fact on this issue in response to Defendants' Motion.

### 2. *Alleged Loss to the Plan*

▮ Plaintiffs acknowledge that to prevail on their imprudence claim, they must establish that Defendants' actions caused a loss to the plan. (*See* Pls.' Mem. P. & A. 5; Pl.'s Opp'n 7.) Plaintiffs contend that "damages in this case consist of the difference between the actual performance of CSC common stock during the Class Period and what that stock position in the Plan would have earned if, hypothetically, it had been reinvested in an equally plausible and most appropriate investment alternative." *Id.* at 17 (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1054–56 (2nd Cir.1985)).[5]

---

**5.** Defendants note in a footnote in their Reply that the *Donovan* court was not faced with allegations that "information that would af-

fect the market price was improperly withheld from the plaintiffs," and that the court explained that in such a case, "it may well be

To establish this loss, Plaintiffs cite to the 12% decline in stock price following CSC's announcement of the SEC investigation. They argue that prior to this announcement, the market price of CSC common stock was inflated because CSC had been issuing incorrect and overstated financial statements, and that the stock price "suddenly declined when the scheme was exposed." *Id.* (citing *In re Syncor ERISA Litig.*, 516 F.3d at 1102).

However, Plaintiffs offer no evidence of what reinvestment in an "equally plausible and most appropriate investment alternative" would have earned the Plan. *See Donovan*, 754 F.2d at 1054–56. Although Plaintiffs state that they have applied the *Donovan* hypothetical alternative investment standard, and cite to their expert report by Thomas A. Myers in support,[6] the portions of this report Plaintiffs cite to do not discuss what alternative investments would have yielded. Instead, the report states the ways in which Myers believes Defendants breached their fiduciary duties, but nowhere that the Court could find does it even mention investment alternatives, let alone opine that such alternatives would have performed better than CSC stock. (*See generally* Myers Expert Report, filed as Myers Decl. Ex. A.; *see also id.* at 3–10 (cited at Pls.' Opp'n 18, Ex. C).) It is not the Court's task to "scour the record in search of a genuine issue of triable fact"; rather, it is the duty of "the non-moving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v.*

*Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (internal citation omitted).

Plaintiffs also submit an "expert affidavit" by R. Alan Miller, in which he states that "it is clear substantial losses and damages were incurred by the Plan and its participants over the Class Period." (Miller Affidavit ¶ 7.) Miller notes that "one example" is the 12% decline, and summarily states that "the performance of alternative investments suffered no such loss." *Id.* This conclusory statements is insufficient to create a genuine issue as to whether investment in an alternative stock would have benefitted the Plan. Moreover, comparing this single decline in CSC stock with the performance of other stocks the same day does not support Plaintiffs' contention that the Plan's losses consist of "the difference between the actual performance of CSC common stock *during the Class Period* and what that stock position in the Plan would have earned if, hypothetically, it had been reinvested in an equally plausible and most appropriate investment alternative." (*See* Pls.' Mem. P. & A. 17) (emphasis added). Instead, Plaintiffs would need to present evidence of the performance of CSC stock compared to another investment alternative for the duration of the class period; Plaintiffs have presented no such evidence. In addition, although Plaintiffs allege that Defendants' "tax related significant deficiencies" caused CSC to restate its financial statements, they fail to allege or present any evidence that these deficiencies caused losses to the Plan. (*See* Pls.' Opp'n 16.)

that the best measure of damages is one that awards the plaintiff the difference between what was paid for the stock, and what would have been paid had the plaintiff been aware of the concealed information." (Defs.' Reply n. 5, citing *Donovan*, 754 F.2d at 1055). Under either measure of loss, Plaintiffs have failed to meet their burden.

6. Defendants make a general objection to Myers' report, stating that his "characterizations ... are both inadmissible hearsay and beyond the permissible scope of expert witness opinion." (Defs.' Response to Pls.' Statement of Uncontroverted Facts ¶¶ 30, 37, 39, 41, 42.) However, the Court overruled these objections and considered the report in its entirety.

Accordingly, Plaintiffs have failed to meet their burden of establishing loss as to their Motion, and have failed to create a triable issue in response to Defendants' Motion. *See Donovan*, 754 F.2d at 1054–56.

### 3. *Causation*

Defendants argue that the decline in CSC stock price is insufficient to make their continued offering of a CSC Stock Fund investment option for Plan participants imprudent. They claim that Plaintiffs have failed to demonstrate that the declines were caused by their announcement of an SEC investigation. They note that in addition to announcing that the SEC was requesting information from CSC, CSC also included in the same announcement that it was initiating a $2 billion stock buy back and was no longer seeking a strategic partner or sale. (June 29, 2006 News Release; Garrett Decl. ¶ 13.) Further, Defendants point out that although CSC stock prices fell from $55.88 to $48.56 the day after the announcement, the price rose to $50.63 on July 3, 2006, and reached $53.57 less than two weeks later. (Garrett Decl. Ex. 3A at 41.) Defendants also note that less than 13 months later, the stock price was up to $61.79. *Id.* at 45.

Defendants also point out that CSC's February 28, 2007 announcement that over 9,000 stock option grant dates had to be adjusted caused no significant decline in CSC stock. (*See* Garrett Decl. Ex. 3A at 44.) The CSC stock closed at $52.50 the day before the announcement, at $52.93 the day of the announcement, and at $52.15 the day after the announcement. *Id.* Defendants argue that if CSC stock was inflated and declined as a result of announcements about backdating, as Plaintiffs claim, then their February 2007 announcement that so many grants had to be adjusted should have caused a significant decline, as Plaintiffs argue the June 2006 announcement did. The non-impact of the February 2007 announcement suggests that the June 2006 drop may have been caused by the other announcements CSC made at the same time as that about the SEC investigation. Defendants also provide a chart comparing the AMEX Technology Select Sector Index and CSC stock price during the class period, which demonstrates that the fluctuations in the price of CSC stock during the Class Period largely tracked the movement of the AMEX Technology Select Sector Index. (Chart, filed as Garrett Decl. Ex. 2.) The fact that CSC stock fluctuations are in line with the general movement of similar stocks during the entire Class Period undercuts Plaintiffs' argument that any drops in CSC stock price were caused by Defendants' announcements.

In addition, Defendants reject Plaintiffs' argument that the SEC investigation and drop in stock price were due to a lack of internal controls. They explain that CSC developed and maintained a "narrative" which described the process of granting stock options and company controls over them, and that the narrative was regularly edited and updated. (Dooley Decl. ¶ 4.) The narrative included documentation of "the authorizations necessary to award stock option grants and related controls, such as controls over maintenance of records outstanding, vested, exercisable and exercised stock options, associated stock option exercise prices, proceeds on exercise of stock options and related tax benefits, proceeds and contribution paid in capital as a result of stock option exercise, and compensation expense associated with discounted stock options, restricted stock and restricted stock units." *Id.* Defendants also state that CSC's internal audit department regularly tested those controls, and that in 1998, CSC implemented a software program called "Equity Edge" to track stock option information required for fi-

nancial reporting purposes. *Id.* ¶ 6. Lastly, in 2005 Defendants appointed Deloitte and Touche as CSC's independent auditors. (*See* CSC's June 23, 2005 Definitive Proxy Statement, filed as Bishop Decl. Ex. 2, at 8; Dooley Decl. ¶ 12.)

In support of their internal controls argument, Plaintiffs cite only CSC's adjustment of over 9,000 stock option grants, and Vollrath's admissions. However, Plaintiffs' attempt to infer from the fact that errors may have occurred that internal controls were necessarily lacking is flawed. The simple fact of an error does not demonstrate that internal controls were insufficient. As Defendants point out, even with internal controls, "it is not uncommon for public companies to identify errors and then to correct them." (Defs.' Opp'n 10.) Accordingly, Plaintiffs fail to demonstrate a lack of internal controls, and do not identify what internal controls they believed to be lacking.

In sum, Plaintiffs have failed to show that Defendants' continued offering of CSC stock as an investment option caused a loss to the Plan. Although they have shown that the CSC stock price temporarily declined 12% following Defendants' announcement, they have presented absolutely no evidence that investment in "an equally plausible and most appropriate investment alternative" would have put the Plan in a better position than continued investment in CSC stock, or that Plaintiffs would have paid or received a different price for CSC stock had they been aware of the allegedly concealed information. *See Donovan,* 754 F.2d at 1054–56. Further, Plaintiffs have presented no evidence to support the contention that the entire 12% decline was due to the announcement regarding the SEC investigation, rather than the several other significant announcements simultaneously made by CSC. To the extent the Plan may have been harmed by this 12% loss, Plaintiffs

have also failed to raise genuine issues of material fact regarding whether the decline was caused by Defendants' alleged imprudence.

For the foregoing reasons, Plaintiffs have failed to meet their burden of demonstrating that Defendants acted imprudently and that no genuine issue of material fact exists so as to warrant summary judgment in their favor. Additionally, Defendants have met their burden of establishing that Plaintiffs have not produced sufficient evidence to support their imprudence claim, and Plaintiffs have failed to identify genuine issues of material fact in response. Accordingly, the Court DE-NIES Plaintiffs' Motion and GRANTS Defendants' Motions as to Plaintiffs' imprudent investment claim.

B. *Alleged Misrepresentation and Non–Disclosure of Material Information*

█ ERISA regulations require that plan participants be provided with "a general description of the investment objectives and risk and return characteristics of each such alternative, including information relating to the type and diversification of assets comprising the portfolio of the designed investment alternative." 29 C.F.R. § 2550.404c–1(b)(2)(ii). In addition, "an ERISA fiduciary has both a duty not to make misrepresentations to plan participants, and an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." *In re First Am. Corp. ERISA Litig.,* No. 07–1357, 2008 WL 5666637, at *5, 2008 U.S. Dist. LEXIS 83832, at *16 (C.D.Cal. July 14, 2008) (citing *In re Polaroid ERISA Litig.,* 362 F.Supp.2d 461, 478 (S.D.N.Y.2005)). Accordingly, "a fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made

negligently or intentionally." *Krohn v. Huron Mem. Hosp.*, 173 F.3d 542, at 547 (6th Cir.1999).

■ To allege and prove a breach of fiduciary duty for misrepresentations, "a plaintiff must establish each of the following elements: (1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation." *Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 73 (3d Cir.2001); *see also Schulenberg v. Rawlings Co.*, No. 03–134, 2003 WL 22129230, at *5–6, 2003 U.S. Dist. LEXIS 17646, at *15–16 (D.Nev. Aug. 20, 2003) (granting summary judgment on claim of breach of fiduciary duty based on misrepresentation because plaintiff presented no evidence of detrimental reliance).

### 1. *Fiduciary Status*

■ ERISA liability arises from misleading statements only if the statements are made in a fiduciary, not corporate, capacity. *See Alvidres v. Countrywide Fin. Corp.*, No. 07–5810, 2008 WL 819330, at *3, 2008 U.S. Dist. LEXIS 27431, at *7 (C.D.Cal. Mar. 18, 2008) (citing *Pegram v. Herdrich*, 530 U.S. 211, 225–26, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)). "Those who prepare and sign SEC filings do not become ERISA fiduciaries through those acts, and consequently, do not violate ERISA if the filings contain misrepresentations.... Those who are ERISA fiduciaries, however, cannot in violation of their fiduciary obligations disseminate false information to plan participants, including false information contained in SEC filings." *In re First Am. Corp. ERISA Litig.*, 2008 WL 5666637, at *6, 2008 U.S. Dist. LEXIS 83832, at *18–19. Moreover, when a company "intentionally connect[s] its statements about [its] financial health to statements it ma[kes] about the future of benefits," the statements may be viewed as made in a fiduciary capacity. *See Varity*, 516 U.S. at 505, 116 S.Ct. 1065; *Alvidres*, 2008 WL 819330, at *3–4, 2008 U.S. Dist. LEXIS 27432 at *8 (holding complaint stated claim for misleading statements made in fiduciary capacity where it alleged that summary plan description incorporated by reference misleading statements made in SEC filings, citing *Varity* ).

Plaintiffs argue that Defendants breached their duty of loyalty by failing to disclose to Plaintiffs the true risk and return characteristics of the CSC stock. They state that Defendants circulated prospectuses to Plan participants which "incorporated materially false financial statements—statements which had to be restated because they did not comply with GAAP." (Pls.' Mem. P. & A. 17, citing December 2000 and April 2001 Matched Asset Plan Prospectuses (the "Prospectuses"), filed as Bishop Decl. Exs. 25, 26.) The Prospectuses incorporate by reference "all reports and other documents filed by the Company after the date hereof pursuant to Sections 13(a) or (c), 14 or 15(d) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), prior to the filing of a post-effective amendment which indicates that all securities offered hereunder have been sold or which deregisters all such securities then remaining unsold." (*See* Ex. 25 at 1524, Ex. 26 at 1547). Plaintiffs also argue that due to CSC's backdating of stock options, a June 2005 proxy statement which CSC provided to Plan participants was inaccurate in stating that "[a]ll options currently granted have an exercise price equal to 100% of the market value on the option grant date." (Bishop Decl. Ex. 2.) Defendants do not address the Prospectuses' apparent incorporation by reference of various SEC filings. Defendants argue,

however, that the 2005 proxy statement is not actionable because statements in public filings are not fiduciary in nature, regardless of whether they are incorporated by reference in materials provided to participants. (Defs.' Opp'n 17, citing *Kirschbaum*, 526 F.3d 243, 257 (5th Cir. 2008)).

 While there appears to be a split of authority on this issue, courts within the Ninth Circuit have taken the position that such documents can give rise to ERISA liability when the defendant intentionally incorporates them into plan documents, and that fiduciaries "cannot in violation of their fiduciary obligations disseminate false information to plan participants, including false information contained in SEC filings." *See In re First Am. Corp. ERISA Litig.*, 2008 WL 5666637, at *6, 2008 U.S. Dist. LEXIS 83832, at *18–19; *see also Alvidres*, 2008 WL 819330 at *3–4, 2008 U.S. Dist. LEXIS 27432 at *8. As such, SEC filings that Defendants incorporated into the Prospectuses are actionable, thus making "all reports and other documents filed by the Company after [December 2000] pursuant to Sections 13(a) or (c), 14 or 15(d)" actionable. The proxy at issue was filed pursuant to § 14(a), and the Form 8–K, 10–K, and 11–K reports were filed pursuant to §§ 13 and 15(d). Thus, Defendants can be liable in their fiduciary capacity for alleged misstatements or omissions in these documents.

### 2. *Material Misrepresentations*

 "A misrepresentation is material if there is a substantial likelihood that it would materially mislead a reasonable employee in making an adequately informed [plan investment] decision." *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 461 (3rd Cir.2003). In support of their claim of material misrepresentations and omissions, Plaintiffs cite Myers' opinion that "any indication made by CSC

in its Form 10–K and/or proxies during the relevant period that options were issued with exercise prices equal to 100% of the fair market value of CSC's stock on the date of grant, which is intended to indicate to the reader that they were issued 'at the money,' were false and misleading because, as evidenced by the restatement, many options were by definition not issued 'at the money.'" (Pls.' Opp'n 14.) Myers further states that "the Forms 10–K and proxies during the relevant period were false and misleading because they failed to disclose, as required, certain issues related to compensation provided to the top 5 executives, including several of the individual Defendants, regarding the repricing of options granted to those individuals." *Id.* (citing Myers Report 71.)

Specifically, Plaintiffs argue that Defendants violated the guidance provided in Accounting Principles Board Opinion Number 25, issued in October 1972, which defined the measurement date of a stock option as "the first date on which are known both (1) the number of shares that an individual employee is entitled to received and (2) the option or purchase price, in any." (*See* Sept. 19, 2006 Office of Chief Accountant Guidance Letter, at 1 (citing APB Opinion No. 25 ¶ 10.)) In September 2006, the Office of the Chief Accountant issued a guidance letter (the "Letter") noting that there had been some confusion as to what the correct measurement date was when a company approved an aggregate number of options prior to preparing a final list of individual employee recipients. *See id.* ¶ D. The Letter clarified that in such situations, the measurement date was the date the company determined the number of shares each employee was entitled to receive, pursuant to paragraph 10(b) of Opinion 25. *Id.*

Defendants dispute that their financial statements violated GAAP, explaining that

CSC had to adjust the measurement dates of approximately 9,000 grants due to "a question of whether the measurement date was the grant date that had been set, or a later date on which each individual recipient was identified and his or her award was specifically determined," not due to any GAAP violations or errors. (Defs.' Mem. P. & A. 16.) They explain that CSC's practice had been to first approve a block of grants, then later allocate shares to specific individuals at a later date. (Dooley Decl. ¶ 8.) CSC had used as its measurement date the date on which the block of grants was approved. *Id.* Based on the clarification provided in the Letter, CSC adjusted its measurement dates to reflect the dates that the individuals were identified and their shares determined. *Id.* Based on these adjustments, CSC adjusted its financial statements to increase the non-cash compensation expense by approximately $68 million. Defendants explain that because these adjustments represented only 1.4% of CSC's aggregate net income, and because they were not the result of intentional wrongdoing, they concluded they were not material. They explain that as "a rule of thumb," any adjustment that falls below roughly 5% of net income is not material. *Id.* ¶ 9.

While the SEC has acknowledged the existence of this "rule of thumb," it has stated while "the use of a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that— without considering all relevant circumstances—a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statement is unlikely to be material ... misstatements are not immaterial simply because they fall beneath a numerical threshold." (SEC Staff Accounting Bulletin No. 99.). Instead, companies must consider not only quantitative but also qualitative factors, and ultimately an "omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." *Id.*

Here, it is highly unlikely that statements indicating that stock options were issued at 100% of the fair market value of CSC stock on their grant date, and omissions about executive compensation, would materially affect a reasonable employee's decision to invest in CSC stock. Indeed, Plaintiffs advance no argument or evidence to suggest that inclusion of accurate information on these issues would influence or change a reasonable person's investment decisions. Thus, the Court finds that these alleged misrepresentations and omissions are not material.

Plaintiffs also allege that a CSC newsletter entitled "Solutions" "stated, in substance, that it was the market, not CSC" which caused the significant late-June 2006 market decline. (Pl.'s Mem. P. & A. 17, citing Solutions, filed as Bishop Decl. Ex. 10.) Plaintiffs argue this newsletter was misleading because it did not state that the price decline was due to CSC's admission that it was being investigated by the SEC in relation to its stock option program. The Court rejects Plaintiffs' interpretation of the "substance" of the newsletter, especially in light of the fact that it clearly states that "the views expressed in this commentary are the views of Christopher Probyn, Ph.D., *through the period ended June 15, 2006* and are subject to change based on market and other conditions." *Id.* (emphasis added). As the "late-June 2006 market decline" to which Plaintiffs refer occurred on June 30, 2006, this newsletter can in no way constitute a material misrepresentation as to that decline.

### 2. *Detrimental Reliance*

As Defendants point out, Plaintiffs do not allege detrimental reliance on the alleged misrepresentations. In response, Plaintiffs argue that they "need not prove detrimental reliance for this Court to grant partial summary judgment in Plaintiffs' favor." (Pls.' Reply 2–3.) In support of their position, they cite a number of cases which hold that plaintiffs need not show reliance to prevail on claims for breach of fiduciary duty based on imprudent investment. *See DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 83 (E.D.Va. 2006); *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241 (2d Cir.1989); *In re Elec. Data Sys. Corp.*, 224 F.R.D. 613, 623 (E.D.Tex.2004). Plaintiffs are correct that for their imprudent investment claim, they need not show detrimental reliance, but instead need only show that "there was a fiduciary breach and that but for the breach, the Plan's assets would have been greater." *See, e.g., Dardaganis*, 889 F.2d at 1243. However, for claims of misrepresentation, reliance is required. *See Schulenberg*, 2003 WL 22129230, at *5–6, 2003 U.S. Dist. LEXIS 17646, at *15–16. Indeed, one of the cases Plaintiffs cite to support their argument that no reliance is required explicitly states that "a plaintiff must establish reasonable and detrimental reliance upon a material misrepresentation to recover for breach of fiduciary duty based on misrepresentations." *See In re Elec. Data Sys. Corp.*, 224 F.R.D. at 630.

Moreover, Plaintiffs admitted at their depositions that they relied only on information other than the documents at issue in making their Plan investment decisions. Plaintiff Gray stated that he relied solely on his financial advisor in making his investment decisions, that he has not reviewed any securities filings in connection with his investment in the Plan, and that he has not changed his investment allocation from the time of his initial decision in January 2001. (Gray Dep., filed as Blankenstein Decl. Ex. A, 25:3–6, 58:4–7, 58:18–23.) Similarly, Plaintiff Shamaly looked only at the past performance of the investment options in making her decisions (Shamaly Dep., filed as Blankenstein Decl. Ex. B., 41:8–21), and Plaintiff Quan considered only CSC's products and services and the summary performance reports provided by the Plan (Quan Dep., filed as Blankenstein Decl. Ex. C, 107:4–14). When asked what materials he reviewed before deciding to invest in CSC stock, Plaintiff Ballard stated that "other than the information that comes, and that tells you about the investment selections, I think that's probably all that I kind of reviewed." (Ballard Dep., filed as Blankenstein Decl. Ex. D, 65:9–14.) Ballard also stated that he did not review any SEC filings, but that he reviewed CSC proxy statements "on occasion" and did not remember which ones. (Ballard Dep., filed as Blankenstein Decl. Ex. D, 136:25–137:7, 142:20–25). That Ballard reviewed unspecified proxy statements is wholly insufficient to raise a genuine issue as to whether Plaintiffs detrimentally relied on the 2005 proxy statement. In Plaintiffs' Response to Defendants' Additional Genuine Issues of Fact and Supporting Evidence, Plaintiffs cite several statements that indicate that Plaintiffs may have read some of the documents at issue over the last several years. (*See* Pls.' Response ¶¶ 67–70.) However, these vague statements, which fail to suggest that Plaintiffs actually read the specific documents at issue and that the alleged misrepresentations in the documents affected their investment decisions, are not enough to create a genuine issue as to whether Plaintiffs detrimentally relied.

Accordingly, as Plaintiffs have failed to produce evidence sufficient to create a genuine issue of material fact regarding the materiality of the alleged misrepresentations or detrimental reliance on them,

the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion on Plaintiffs' misrepresentation claim.

### C. Duty to Properly Appoint, Monitor and Inform the Committee and Its Members

 "Under ERISA, fiduciaries have a limited duty to monitor and review the performance of their appointed fiduciaries. In particular, appointing fiduciaries should review the performance of their appointees at reasonable intervals and in such a manner as may be 'reasonably expected to ensure that their performance has been in compliance with the terms of the plan' and statutory standards.'" *In re Syncor ERISA Litig.*, 410 F.Supp.2d 904, 912 (C.D.Cal.2006) (citing 29 C.F.R. § 2509.75-8 (FR–17); *In re Calpine Corp. ERISA Litig.*, No. 03–1685, 2005 WL 1431506, at *6, 2005 U.S. Dist. LEXIS 9719, at *19–20 (N.D.Cal. Mar. 31, 2005)).

Plaintiffs allege that Defendants Honeycutt, Bailey, McFarlan, and Patrick, members of CSC's Board of Directors, breached their fiduciary monitoring duties by: (1) "failing to ensure that the Committee had access to knowledge about CSC's business problems ... which made CSC stock an imprudent retirement investment"; and (2) "failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in CSC stock...." (Sec. Am. Compl. ¶ 125.)

"Plaintiffs' duty to monitor claim is derivative of their prudence claim." *In re Syncor ERISA Litig.*, 410 F.Supp.2d at 913. Accordingly, because Plaintiffs' prudence claim fails for the reasons stated above, their monitoring claim also fails. *See id.* (granting summary judgment on plaintiffs' claim against directors for failure to monitor committee members and provide them with accurate information because court granted summary judgment on their prudence claim) (*rev'd on other grounds*); *see also In re Calpine Corp. ERISA Litig.*, 2005 WL 1431506, at *6, 2005 U.S. Dist. LEXIS 9719, at *19–20 (holding that failed prudence claim mooted plaintiffs' monitoring claim because it was derivative of the prudence claim). The Court thus GRANTS Defendants' Motion on this claim.

### D. 404(c) Affirmative Defense

Plaintiffs ask the Court to strike Defendants CSC, the Committee, and Level's affirmative defense under ERISA § 404(c) as to Plaintiffs' imprudent investment claim. As Plaintiffs have failed to sustain their burden regarding their imprudent investment claim, the issue of Defendants' affirmative defenses to it is moot. Accordingly, the Court declines to address this portion of Plaintiffs' Motion.

### III. RULING

For the foregoing reasons, the Court DENIES Plaintiffs' Amended Motion for Partial Summary Judgment, and GRANTS Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.